NANCY SOTTILE, Plaintiff-Appellant, v. ANDREW CARNEY, Defendant-Appellee.

First District (1st Division)   No. 1—90—1197

Opinion filed June 22, 1992.

David A. Novoselsky & Associates, of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellant.

Bullaro, Carton & Stone, of Chicago (James R. Branit and Madeleine Weldon-Linne, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff Nancy Sottile filed a complaint against defendant Andrew Carney, M.D. alleging medical negligence against defendant for the treatment she received from him and that defendant failed to adequately inform her of possible complications which could result from the surgery. The jury found in favor of defendant and against plaintiff. Thereafter, the circuit court denied plaintiff's post-trial motion. Plaintiff appeals the denial of her post-trial motion and the jury's verdict.

As a young adult, plaintiff suffered from facial flushing and dizzy spells. Plaintiff also complained about sharp pains on the right side of her head of such severity that she would vomit. Some time between 1975 and 1977, plaintiff began experiencing problems with her walk, such as unsteadiness and falling to one side. Prior to December 1979, plaintiff's symptoms worsened and she began experiencing imbalance almost every day. Due to this condition, plaintiff was referred to Dr. Arvind Kumar.

Kumar performed several tests on plaintiff, all of which indicated that plaintiff had poor blood circulation to the brain. Kumar, therefore, referred plaintiff to CT Headscan for a dynamic CT scan. Dr. M.F. Mafee at CT Headscan performed the scan. Mafee's analysis also

concluded that plaintiff's blood circulation to the brain was poor. After receiving Mafee's analysis, Kumar referred plaintiff to defendant.

On December 3, 1979, plaintiff was admitted to Oak Park Hospital, which is where and when defendant saw plaintiff for the first time. Defendant took a brief medical history from plaintiff during which plaintiff informed defendant that for the past three years she had been suffering from disequilibrium, numbness in the left arm and hand at night, pain on the right side of her head, weakness in her legs which caused her knees to buckle, resulting in her falling, an inability to stand in the morning when getting out of bed, walking into objects and hitting her right side, and blurred vision. Defendant observed that plaintiff repeated words, slurred her speech and suffered severe memory impairments. The above symptoms would worsen when plaintiff was upset.

On December 4, 1979, defendant performed a physical examination on plaintiff. Defendant also performed a passive tilt test. During the test, plaintiff's blood pressures were checked. Further, the test allowed defendant to make a brachycephalic arterial evaluation from which he concluded that plaintiff's neck artery was displaced and had tortuosity. Then, defendant examined plaintiff's neck artery with a directional doppler and found that the blood velocity on both her right and left sides was low. Additionally, an ocular pulse transmission time test supported a diagnosis of a system problem along with a vascular problem. Plaintiff's ocular pulse amplitude test was below normal, indicating an obstruction of her carotid artery on the right side. Defendant, therefore, performed a carotid compression test which further indicated the possibility of a right artery obstruction.

Plaintiff, then, underwent a four-vessel angiogram. The angiogram confirmed that plaintiff had considerable tortuosity of the right internal carotid artery, some tortuosity of a portion of the right vertebral artery, tortuosity of the left internal carotid artery and kinking at the origin of the left vertebral artery. Moreover, the angiogram showed that the right carotid artery folded upon itself with a hairpin tight obstruction at the level of the hypoglossal nerve. The angiogram also indicated dynamic obstructions of all four arteries with the worst obstruction being the right internal carotid.

Defendant reviewed plaintiff's medical records from Illinois Masonic Hospital, including an isotope brain scan. The brain scan revealed a localized isotope concentration over the right middle cerebral artery. The records denoted right coronary artery disease, and reported a primary diagnosis of cerbrovascular insufficiency with vere-

bral basilar disequilibrium. The Illinois Masonic findings were consistent with defendant's work-up of plaintiff.

Defendant took an electroencephalogram (EEG) of plaintiff. The EEG disclosed low voltage. The EEG results were consistent with a diagnosis of carotid obstruction. Similarly, the EEG established that plaintiff was not getting enough blood to the brain.

Based upon the above litany of tests, findings and observations, defendant concluded that plaintiff had inadequate blood flow to the brain and coronary insufficiency. Defendant opined that there was a need to surgically reconstruct plaintiff's right carotid artery. Defendant claims that during a conversation with plaintiff, he explained that the surgery would involve the use of an anesthetic which could cause a stroke, heart attack or death. Defendant also informed plaintiff that he would be using a transverse incision which would divide more nerves, but which would heal better. Defendant testified that he told plaintiff that there would be some pain from the incision. Further, defendant testified that he informed plaintiff that she could get numbness in her face and ear. Additionally, defendant told plaintiff that the surgery may not have any benefit, but, on the other hand, that it may help her recover certain functions.

Plaintiff denied that the above conversation took place. Plaintiff's memory, however, is, by her own admission, terrible. Plaintiff explained, "I can't remember what I ate yesterday let alone ten years ago." Plaintiff's son also admitted that plaintiff's short-term memory from 1979 until the trial was poor. Moreover, plaintiff's son admitted that plaintiff had told him that defendant had been in to talk to her alone about the surgery. Furthermore, defendant also had a second conversation with plaintiff at which plaintiff's son was present. During the second conversation, defendant repeated the informed consent conversation in shorter form.

On December 10, 1979, defendant performed the surgery to which plaintiff agreed. During the surgical procedure, the greater auricular nerve was severed to gain access to the carotid artery. Plaintiff is not contending that the surgery itself was negligently performed. Rather, plaintiff claims to post-operatively suffer pain in the area of the incision and numbness and pain in her face, neck and right ear.

Dr. Glenn Dobben, an associate of Dr. Mafee, who had conducted plaintiff's CT scan, testified on behalf of defendant as an expert witness. Plaintiff admitted that Dobben was never actually one of her treating physicians. Dobben testified that the surgery was indicated by all the tests, findings and observations and was, therefore, necessary. Dobben opined that defendant not only met the standard of care,

but that he performed better than the standard and, therefore, "should be commended."

After filing her complaint, plaintiff named Mafee as a respondent in discovery pursuant to section 2—402 (Ill. Rev. Stat. 1987, ch. 110, par. 2—402). Counsel filed a limited appearance on behalf of Mafee, along with a motion to dismiss Mafee as a respondent in discovery. The motion stated that Mafee was "being required to give evidence as a 'potential defendant' without being apprised of what allegations or what charges [might] be brought against him." Plaintiff contested the motion.

Then, plaintiff issued a subpoena for the deposition of the administrator of Oak Park Hospital. Plaintiff served Mafee's counsel with a notice to produce "all material regarding the granting of privileges and reappointment of privileges regarding Doctor(s) [sic] Dr. Andrew L. Carney and Dr. M. F. Mafee," thereby indicating that Mafee remained a potential defendant. Mafee's deposition was taken on August 26, 1981, at which he produced all his office's medical records regarding plaintiff. The only medical record that Mafee had regarding plaintiff was the CT scan which took 40 minutes to perform. Mafee had sent a report to Kumar, and thereafter had no contact with or knowledge of plaintiff.

On May 27, 1987, defendant filed a motion for summary judgment to which Dobben's affidavit was attached. Plaintiff filed a response to the motion, including a statement that plaintiff needed to depose Dobben. On December 13, 1988, plaintiff took Dobben's deposition. At that time, plaintiff made no objection to Dobben testifying as an expert witness on behalf of defendant. Plaintiff's counsel admits that on the date of Dobben's deposition, at the latest, she was aware that Dobben had engaged in *ex parte* communications with defense counsel.

The present case had originally been assigned for trial on April 25, 1989. On October 31, 1989, the trial judge assigned the case the trial date of November 20, 1989. On November 26, 1989, plaintiff filed a motion to bar Dr. Dobben's testimony. Plaintiff did not seek a hearing on this motion until after the jury had been selected.

Prior to Dobben testifying, the circuit court conducted an examination of Dobben outside the presence of the jury. Dobben confirmed that he was one of the partners at CT Headscan, where Mafee had performed plaintiff's scan. Dobben stated that he had no connection or relationship with plaintiff as an attending physician and was not even present in the office the day plaintiff's scan was performed. The

first time Dobben heard plaintiff's name was when he was asked by defense counsel to look over her records.

Plaintiff argues that the circuit court erred by failing to bar the testimony of Dobben as an expert witness on behalf of defendant because of *ex parte* communications between Dobben and defense counsel. According to plaintiff's argument, Mafee performed a CT scan on plaintiff, and since Dobben was an associate of Mafee's, any *ex parte* communications Dobben had with defense counsel violate the holding of *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952; thus, the circuit court should have barred Dobben's testimony. Defendant argues that plaintiff waived the *Petrillo* issue. We agree.

■ Plaintiff waived her rights under *Petrillo* by failing to assert those rights in a timely fashion. It is within a trial court's discretion to deny a motion pertaining to evidence on the basis that it was untimely. (See, *e.g., In re Estate of Rothenberg* (1988), 176 Ill. App. 3d 176, 185, 530 N.E.2d 1148, 1154.) A party who " 'knowingly refrains from asserting [an objection] promptly in order to reserve it for the most expedient time, may be deemed to have waived that right.' " (*Roth v. Roth* (1980), 84 Ill. App. 3d 240, 244-45, 405 N.E.2d 851, 855, quoting *Lau v. Valu-Bilt Homes, Ltd.* (1978), 59 Haw. 283, 297, 582 P.2d 195, 204.) The Illinois Supreme Court recently held that a party was guilty of *laches* because he was aware of his right, knew that he could assert that right one year prior to asserting it, and that since the party did not diligently assert his right and other parties would be substantially prejudiced if allowed to do so at this time, *laches* applied. *Tully v. State* (1991), 143 Ill. 2d 425, 434, 574 N.E.2d 659, 662-63.

■ Regarding the waiver issue, *Gong v. Hirsch* (7th Cir. 1990), 913 F.2d 1269, is also persuasive and analogous to the case at bar. In *Gong*, moments before the trial was to resume, plaintiff's counsel moved to bar the testimony of a doctor on the basis of improper *ex parte* communications under *Petrillo*. Because the plaintiff had ample notice of the alleged *ex parte* communication and that the doctor would be called as a witness, the Seventh Circuit found that the district court did not abuse its discretion in refusing to hear plaintiff's counsel's motion. (*Gong*, 913 F.2d at 1273.) In the present case, plaintiff admittedly knew no later than December 13, 1988, that Dobben had engaged in *ex parte* communications with defense counsel and that defendant was using him as an expert. Nevertheless, plaintiff waited over 11 months before she filed her motion to bar Dobben based upon *Petrillo*. Then, plaintiff failed to seek a hearing on that

motion until after the jury had been selected. Based upon the above-cited cases and the circumstances in the present case, we find that the circuit court was within its discretion to deny plaintiff's motion to bar Dobben's testimony. We, therefore, hold that by failing to assert her right in a timely manner, plaintiff waived the *Petrillo* issue.

Next, plaintiff argues that the circuit court improperly instructed the jury on the definition of proximate cause. The circuit court instructed the jury that proximate cause meant "that cause which, in natural or probable sequence, produced the injury complained of." (Illinois Pattern Jury Instructions, Civil, No. 15.01 (2d ed. 1971) (hereinafter IPI Civil 2d).) Plaintiff tendered the full version of IPI Civil 2d No. 15.01, which adds: "It need not be the only cause nor the last or nearest cause. It is sufficient if it concurs with some other acting at the same time, which in combination with it, causes the injury." (IPI Civil 2d No. 15.01.) During the instruction conference, plaintiff's counsel argued that the long version was appropriate because "if [plaintiff] had prior pain, but [defendant] negligently performed surgery and caused her to have pain in that part of the face, I think the prior pain is really relevant." Plaintiff argues that the long version should have been given because plaintiff's alleged psychological condition purportedly contributed to the injury she sustained.

■ It is well established that the short version of IPI Civil 2d No. 15.01 is appropriate where the alleged other cause is a predisposition on the part of a plaintiff to sustain the particular injury. (*Lounsbury v. Yorro* (1984), 124 Ill. App. 3d 745, 752, 464 N.E.2d 866, 870.) The full version of IPI Civil 2d No. 15.01 is appropriate only in cases where there is evidence that something or the acts of *someone other than* the plaintiff and the defendant were a proximate cause of the injury; absent such evidence, the short version must be given. (*Lounsbury*, 124 Ill. App. 3d at 751-52, 464 N.E.2d at 870; *Lewis v. W.F. Smith & Co.* (1979), 71 Ill. App. 3d 1032, 390 N.E.2d 39.) Whether plaintiff's alleged psychological condition may have predisposed her to feel pain or experience more severe pain does not warrant giving the full version of IPI Civil 2d No. 15.01. Moreover, the full version is proper only where there is evidence of actions of *another person* which contributed to the injury. (*Lindsay v. Appleby* (1980), 91 Ill. App. 3d 705, 414 N.E.2d 885.) Since there was no evidence that any other person contributed to plaintiff's alleged injuries, we hold that the circuit court properly gave the short version of IPI Civil 2d No. 15.01.

■ Plaintiff also argues that the circuit court improperly instructed the jury on the law of informed consent. Plaintiff tendered

two instructions to the trial court relating to the issue of informed consent. The proposed instructions stated:

> "A surgeon must obtain the informed consent of a patient before operating upon her."

And:

> "When I use the term 'informed consent' in these instructions, I mean the duty of a surgeon to inform a patient of the foreseeable risks or results of the proposed surgery and the available alternatives."

The circuit court gave the following informed consent instruction tendered by defendant:

> "A surgeon must obtain the informed consent of a patient before operating upon her.
>
> In obtaining informed consent, a surgeon must tell the patient of those risks or results of the proposed surgery and available alternatives, if any, which a reasonable well-qualified surgeon in the same field practicing in the same locality or in similar cases and circumstances.
>
> The only way in which you may decide whether the defendant obtained informed consent which the law required of him is from the evidence presented in this trial by doctors called as expert witnesses.
>
> You must not attempt to determine this question from any personal knowledge you have."

Plaintiff's offered informed consent instructions contain considerable omissions when compared with the given instruction. The given informed consent instruction, even though given before the third edition of IPI was available, is a near verbatim equivalent of IPI's third edition number 105.07.01. Regardless, the circuit court may refuse an instruction which accurately states the law if it is misleading or argumentative. (*Chakos v. Illinois State Toll Highway Authority* (1988), 169 Ill. App. 3d 1018, 524 N.E.2d 615.) Because of its omissions, the circuit court properly refused to give plaintiff's tendered informed consent instructions. We hold that the circuit court was within its discretion when it gave defendant's tendered informed consent instruction.

■ In addition, plaintiff argues that defendant's behavior during trial was so prejudicial as to deny her a fair trial. During direct examination, defendant related his testimony to a personal experience of a juror which was disclosed during *voir dire*. Plaintiff's counsel did not object at that time. Only when defendant inquired whether the jury could see what he was explaining, did plaintiff's counsel object. The

circuit court admonished defendant not to address the jurors. Thereafter, defendant never addressed the jurors. There is nothing to suggest that defendant's actions prejudiced the plaintiff, and therefore, we find that plaintiff was not denied a fair trial due to defendant's direct examination testimony.

■ Plaintiff also argues that defendant's crying during closing argument prejudiced her. After reviewing the record, we found no indication that defendant cried during argument. Since any doubt arising from the incompleteness of the record is resolved against the appellant (*Riopelle v. Northwest Community Hospital* (1990), 195 Ill. App. 3d 750, 755, 552 N.E.2d 1220, 1223, citing *Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 459 N.E.2d 958), we find that plaintiff was not denied her right to a fair trial.

■ Lastly, plaintiff argues that the jury's verdict was against the manifest weight of the evidence. When considering whether a verdict was against the manifest weight of the evidence, a reviewing court must view the evidence in the light most favorable to the appellee. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412, 476 N.E.2d 1232, 1236.) The weight accorded the expert testimony is decided by the trier of fact. (*In re Glenville* (1990), 139 Ill. 2d 242, 565 N.E.2d 623.) This case, like many medical malpractice cases, was a battle of the experts. Dobben testified that the surgery was indicated and absolutely within the standard of care. The jury heard the testimony regarding the procedure by which plaintiff's consent was received. Illinois law dictates that a new trial will not be granted merely because the evidence was conflicting. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969, 973.) In the present case, the medical expert testimony is merely conflicting, and when viewing the remainder of the evidence in a light most favorable to the defendant, we find that the verdict was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.