576 S.E.2d 156

**Marguerite A. BAKALA, Respondent,**

v.

**Zdenek BAKALA, Appellant.**

**No. 25586.**

Supreme Court of South Carolina.

Heard Nov. 19, 2002.

Decided Jan. 27, 2003.

---

1. S.C. Const. art. X, § 3.

614

🔑83

618

Fleet Freeman, of Freeman & Freeman, of Mt. Pleasant; and John B. Kern, of Charleston, for appellant.

Robert N. Rosen and Donald B. Clark, both of Rosen, Rosen, & Hagood, L.L.C., of Charleston; and Alexandra D. Varner, of Mt. Pleasant, for respondent.

Acting Justice FLOYD:

In this domestic case, appellant (Husband) appeals three family court orders regarding contempt, equitable division, and divorce on the ground of adultery. We affirm.

## FACTS

Husband was born in the Czech Republic, which was formerly part of Czechoslovakia, and came to this country as a political refugee. He holds dual U.S. and Czech citizenship. Husband and respondent (Wife) met while both were business graduate students at Dartmouth College. They married after graduation in 1990 while living in New York City.

After marrying, the parties moved to London and then Prague where they both worked. Wife quit working sometime before the birth of their son in 1994. When Czechoslovakia was divided in the early 1990's, Husband co-founded the first full-service investment bank in the Czech Republic, Patria Finance, and was very successful. He also invested in several restaurants through his investment company, Hartig Company. According to Wife, during this time, the parties "traveled a lot and lived very, very well." They renovated a four-story house in one of Prague's most fashionable neighborhoods. Husband's average yearly income was $536,817.

In November 1996, Wife confronted Husband with information that he was having an affair. After a physical altercation, Wife left the marital residence. Two weeks later, she and Husband divided their savings account and, with $198,000, Wife moved back to the U.S. where she eventually settled in Beaufort County.

On May 1, 1998, while Husband was visiting from Prague, Wife had him personally served with a summons and complaint seeking a divorce on the ground of adultery or physical cruelty, custody of the parties' minor son, child support, alimony, and equitable division of the marital estate.

On May 7, Wife filed a motion for temporary relief. A hearing was held June 3, 1998, at which both parties and their attorneys appeared. Husband agreed to submit himself to the jurisdiction of the Beaufort County Family Court on all issues. Following this hearing, as part of its temporary order, the

family court ordered Husband to deposit in escrow $500,000 upon the pending sale of shares of Patria Finance in which he acknowledged owning a 34.5% interest. An additional $250,000 was to be deposited pro rata over the next eighteen months resulting in a payment schedule requiring equal payments of $83,333 each in December 1998, June 1999, and December 1999.

Husband answered and counterclaimed on the merits of Wife's action. He alleged that on the day of the temporary hearing, he had learned that Wife was engaged in an adulterous relationship and accordingly he was entitled to a divorce on the ground of her adultery. In Wife's reply, she admitted she was currently engaged in a relationship that began in June 1997 after the parties had separated. Wife subsequently withdrew her request for alimony.

Meanwhile, Husband returned to Prague while the litigation continued. On June 3, 1999, a pre-trial conference was held at which Husband's counsel appeared. A trial date was set for November 1, 1999. Effective August 13, 1999, counsel was relieved at Husband's request and Husband was ordered to appoint an agent for service or he would be served by mail in the Czech Republic.

The final hearing in the case was held as scheduled on November 1, 1999. Husband did not appear. By order dated December 21, 1999, the family court found Husband in contempt of the 1998 temporary order, ordered child support, equitably divided the marital estate 50/50, and awarded attorney's fees and costs. By order dated December 22, 1999, Wife was granted a divorce on the ground of adultery. These appeals followed.

## ISSUES

1. Is the family court's order dividing the marital estate reversible because of an ex parte communication?
2. Were Husband's due process rights violated?
3. Did service in Prague violate international law?
4. Was the valuation of the marital estate proper?
5. Did the family court retain jurisdiction to determine the validity of the bench warrant?

6. Did the deposit of funds with the court purge Husband of contempt?

7. Was the award of attorney's fees excessive?

8. Should the family court have sua sponte dismissed Wife's complaint on the ground of recrimination?

## DISCUSSION

### 1. *Ex parte communication*

▉ Husband complains the family court relied on an ex parte communication in valuing the marital estate. He claims he was unfairly prejudiced because the evidence does not otherwise support the family court's findings.

As found in the 1998 temporary order, at the time of filing Husband held a 34.5% interest in Patria Finance, the investment bank he co-founded in Prague, and had pending contracts to sell some of his shares. As required by the temporary order, Husband made an initial escrow deposit of $500,000 and made a second deposit of $83,333 in December 1998. He did not make the June 1999 payment. At the time of the final hearing on November 1, 1999, Husband owed two payments of $83,333 each, for a total of $166,666.

The record indicates Husband received a total of $3,049,475 for the sale of a 14.5% interest in Patria; he retained a 20% interest valued at $3,000,000. The total value of the Patria stock in the marital estate is therefore $6,049,475.

After the final hearing on November 1, 1999, the family court faxed to Wife's counsel a hand-written list dividing the marital assets and requested counsel to call the judge. There is no evidence Husband was informed of this fax.

In response to the family court's fax, Wife's counsel forwarded a letter from her financial expert explaining that the court had omitted $2,265,809 from the marital estate. The explanation notes that in dividing the Patria stock, the family court considered only the escrow amounts previously ordered to be paid to Wife under the temporary order and the value of the 20% interest still held by Husband. This division did not take into account the evidence that Husband actually received a total of $3,049,475 from the sale of the Patria stock, or

$2,265,809 more than the amount considered. The record indicates a copy of this letter was faxed to Husband.

The family court's final order conforms to the calculation faxed by Wife's counsel to the family court. The family court ordered Husband to transfer to Wife 10,909 shares from his remaining 20% interest in Patria or pay her $1,636,404, to complete Wife's 50% share of the total Patria asset.

Husband contends the only support for the family court's final order is the calculation by Wife's expert faxed to the family court after the final hearing. He contends this letter was an improper ex parte communication that prejudiced him. He asserts by affidavit that he had no knowledge of the communication between Wife's counsel and the family court until this appeal was filed.[1]

■ Generally, one who has notice and fails to appear cannot complain of an ex parte proceeding. *See People v. Klovstad,* 168 Ill.App.3d 444, 119 Ill.Dec. 141, 522 N.E.2d 803 (1988); *Repp v. Horton,* 44 Ohio App.2d 63, 335 N.E.2d 722 (1974). Here, Husband had notice [2] and intentionally absented himself from the entire evidentiary hearing. The communication between the family court and Wife's counsel introduced no new evidence and was simply a continued discussion of the same matter. Since the entire final hearing was ex parte because of Husband's intentional absence, Husband waived any objection to this post-hearing communication.

■ Further, although ex parte contacts are strongly disfavored, prejudice must be shown to obtain a reversal on this ground. *Ellis v. Proctor and Gamble Distrib. Co.,* 315 S.C. 283, 433 S.E.2d 856 (1993); *Burgess v. Stern,* 311 S.C. 326, 428 S.E.2d 880 (1993). Husband has shown no prejudice.

---

1. Husband's affidavit was submitted in response to Wife's motion to dismiss this appeal which was denied by the Court of Appeals. Our analysis assumes Husband had no notice of the ex parte communication until this appeal was pending. *Cf. Ray v. State,* 527 So.2d 166 (Ala. Crim.App.1988); *Sottile v. Carney,* 230 Ill.App.3d 1023, 172 Ill.Dec. 861, 596 N.E.2d 140 (1992) (where a party knows of the ex parte communication but does not timely object, any objection is waived).

2. As noted above, Husband still had retained counsel when the trial date was set and counsel was informed of this date.

As evidence of prejudice, Husband points to the family court's finding of a total marital estate of $8,384,809, which is greater than the $7,562,846 amount submitted by Wife as exhibit 36 at trial. This difference in the total marital estate, however, is not due to the recalculation of the Patria stock which was the subject of the ex parte communication.

The family court valued the marital residence at $1.5 million based on Wife's testimony and her request for admissions which Husband was deemed to admit by his failure to respond, rather than the $1 million valuation in exhibit 36. Further, the family court included in its calculation of the marital estate a credit of $198,000 to each party for the savings account they divided when they first separated. This credit was not calculated in Wife's exhibit 36 which accounts for only $74,037 from the parties' savings account. These differences in the valuation of the marital home and the savings account explain the difference between exhibit 36 and the order in the total marital estate.

In the family court's final order, neither the valuation of the house nor the $198,000 credit to each party is changed from the judge's hand-written note which issued *before* the ex parte communication from Wife's counsel. Further, these amounts are supported by the record. The division of the Patria stock, the only asset recalculated based on Wife's expert's letter, is also supported by the record. Accordingly, Husband cannot show prejudice from the ex parte communication between the family court and Wife's counsel.

In conclusion, we find Husband waived his objection to the ex parte communication between the judge and Wife's counsel and, further, that he has failed to show prejudice.

### 2. Due process

Husband claims his procedural due process rights were violated by Wife's mailing of various notices [3] pursuant to the family court's order allowing Husband to be served by mail in Prague.

---

**3.** The documents mailed after August 13 were: Requests for Admission; Motion to Allow Plaintiff's Appraiser Access to the Marital Home; Motion to Compel Discovery; Motion to Lift Restraining Order; Motion for Emergency Relief; and Notice of Deposition of Marlene Arbess.

On August 16, 1999, the family court signed an order granting Husband's counsel permission to withdraw from the case at Husband's request, and ordering Husband to appoint an agent for service in the U.S. "within two weeks, or, on or before August 13, 1999." Failure to appoint an agent as directed would render service on Husband effective as of the date of mailing to the Czech Republic for all documents subsequently served. *See* Rule 5(b)(1), SCRCP (service by mail complete upon mailing). This order was filed August 19.

Husband complains service by mail violated his procedural due process rights because he did not have timely notice of the order that he appoint an agent for service. As indicated in the record, mail to the Czech Republic takes ten to fourteen days. Further, the date for appointment of an agent (August 13) was *before* the order itself was filed (August 19).

█ We find Husband waived any objection to the family court's August 19 order allowing service by mail. Although, as Husband correctly points out, it would have been impossible for him to comply with the directive that he appoint an agent for service by August 13, there is no indication Husband *ever* attempted to appoint such an agent. Husband did not appeal the August 19 order, nor does he claim the directive to appoint an agent violated his due process rights. Husband never raised any due process issue to the family court, an issue which could have been raised by a Rule 59(e) motion. A due process claim raised for the first time on appeal is not preserved. *Grant v. South Carolina Coastal Council*, 319 S.C. 348, 461 S.E.2d 388 (1995).

█ Further, the record indicates Wife's counsel both faxed and mailed to Husband every document served subsequent to the August 19 order. Evidence of mailing establishes a rebuttable presumption of receipt. *Weir v. Citicorp Nat'l Servs. Inc.*, 312 S.C. 511, 435 S.E.2d 864 (1993). Here, there is no evidence rebutting this presumption to indicate Husband was deprived of actual notice by Wife's mailing of these various documents.

Finally, there is no evidence Husband was prejudiced by the evidence procured as a result of the discovery notices mailed to him in Prague. The evidence obtained was merely cumulative to other evidence or was not prejudicial in light of the

50/50 division of marital assets.[4] We conclude Husband has failed to show prejudice and we find no merit in his due process claim. *Ross v. Med. Univ. of South Carolina,* 328 S.C. 51, 492 S.E.2d 62 (1997) (one claiming a deprivation of procedural due process must show substantial prejudice).

### 3. International law

Husband contends that service abroad of the various notices mailed after August 19 and service of the Rule to Show Cause underlying the contempt finding violated international law.

### a. Notices

 Husband claims service of the various notices by mail to Prague pursuant to the August 19 order violated the Hague Convention on the Service Abroad of Judicial and Extra–Judicial Documents in Civil and Commercial Matters (Hague Service Convention).

 The Hague Service Convention is an international treaty that pre-empts inconsistent methods of service pre-scribed by state law in all cases where service abroad is required. *Volkswagenwerk v. Schlunk,* 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). Essentially, the Hague Service Convention requires each country to establish a central authority that receives requests for service of documents from other countries, serves the documents, and provides certificates of service. A country may also consent to methods of service other than a request to its central authority. *See generally* Arts. 1–11. Specifically, Article 10(a) provides:

> Provided the State of destination does not object, the present Convention shall not interfere with—
>
> > (a) the freedom to send judicial documents, by postal channels, directly to persons abroad. . . .

According to our Department of State, the Czech Republic bound itself to the Hague Service Convention as of January 1, 1993, but objected to Article 10(a).

---

4. For instance, Husband complains that the deposition of Marlene Arbess provided evidence of his fault. This evidence had no impact on the equal division of marital assets.

By its terms, service abroad by mail is allowed under Article 10(a) where no objection has been lodged by the receiving country. There is considerable controversy, however, regarding whether the Hague Service Convention applies to documents served subsequent to the service of process, and whether Article 10(a) applies to the original service of process or whether it applies only to subsequent documents as indicated by use of the word "send" rather than "serve." *Compare Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8th Cir.1989); *ARCO Electronics Control Ltd. v. CORE Internat'l*, 794 F.Supp. 1144 (S.D.Fla.1992) (art. 10(a) applies only to documents subsequent to service of process); *with In re Mandukich*, 87 B.R. 296 (Bkrtcy.S.D.N.Y.1988); *Schiffer v. Mazda Motor Corp.*, 192 F.R.D. 335 (N.D.Ga.2000) (Hague Service Convention applies only to service of process and not subsequent notices).

If, as some courts have found, the Hague Service Convention applies only to service of process, it is not applicable here. Original service of process in this case was accomplished in South Carolina by personal service and there is no challenge to its validity. Accordingly, the mailing of subsequent documents to Husband in Prague would not violate the Hague Service Convention.

On the other hand, if the Hague Service Convention applies and Article 10(a) allows only subsequent documents to be served by mail, a receiving country's decision to opt out of Article 10(a) amounts to a decision to forbid the use of the mails entirely. *See Randolph v. Hendry*, 50 F.Supp.2d 572, 577–78 (S.D.W.Va.1999). Under this interpretation, Husband claims the mailings to Prague violate the Hague Service Convention.

There is no definitive precedent on the merits of this issue and we need not resolve the issue here. Like Husband's due process argument discussed above, the issue of service in compliance with the Hague Service Convention was never raised to the family court. Accordingly, we decline to address it. *Smith v. Smith*, 275 S.C. 494, 272 S.E.2d 797 (1980) (issue not raised to family court not preserved for review on appeal).

Similarly, Husband raises for the first time on appeal a violation of the Hague Convention on the Taking of Evidence

Abroad in Civil and Commercial Matters (Hague Evidence Convention) to which the Czech Republic also bound itself as of January 1, 1993.

Unlike the Hague Service Convention, the Hague Evidence Convention is not mandatory. It essentially allows discovery abroad through Letters of Request executed by a central authority designated by the signatory country. Arts. 1–3. This procedure is not mandatory and simply provides a method of seeking evidence that a court may *elect* to employ. *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 541, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987). By failing to raise the Hague Evidence Convention to the family court, Husband has waived any argument regarding its application. *See Murphy v. Reifenhauser KG Maschinenfabrik*, 101 F.R.D. 360 (D.Vt.1984) (party's delay in raising issue of Hague Evidence Convention during course of discovery a factor in declining to order compliance).

### b. *Rule to Show Cause*

 Husband complains he was not properly served the Rule to Show Cause heard by the family court as part of the final hearing on November 1, 1999, and upon which Husband was found in contempt for failure to make the June 1999 $83,333 payment from the proceeds of the sale of Patria stock. Husband contends service was invalid under the Hague Service Convention and therefore the family court had no jurisdiction to find him in contempt.

The record includes an affidavit of personal service of the Rule to Show Cause in Prague, signed by Wife's private investigator and notarized, indicating Husband saw the documents as they were being handed to him on the street and he refused to take them. The investigator picked up the documents from the ground and "desisted from further attempts to deliver the papers."

 The Hague Service Convention clearly applies to the service of process. *Volkswagenwerk, supra.* A contempt proceeding regarding contemptuous conduct outside the presence of the court, as here, must be commenced by service of process, which includes a rule to show cause. *State v. John-*

*son,* 249 S.C. 1, 152 S.E.2d 669 (1967). The Hague Service Convention requires that such process be served through the Central Authority of the signatory country.

When service is challenged, the record must affirmatively show that service of process was correctly made. *Jensen v. Doe,* 292 S.C. 592, 358 S.E.2d 148 (Ct.App.1987) *citing Matheson v. McCormac,* 186 S.C. 93, 195 S.E. 122 (1938). Here, there is no indication that service was attempted through the Central Authority of the Czech Republic. Under Article 15 of the Hague Service Convention, process must be served "by a method prescribed by the internal law" of the signatory country or actually delivered to the.defendant or to his residence. The record does not indicate either of these conditions was met and accordingly it appears service of the Rule to Show Cause was not accomplished in compliance with the Hague Convention.

Husband never raised this issue, however, which, assuming he never received notice of the contempt charge until entry of the final order, he could have raised by post-trial motion. Service of process under the Hague Service Convention relates to personal jurisdiction. Objections to personal jurisdiction, unlike subject matter jurisdiction, are waived unless raised. *Shinn v. Kreul,* 311 S.C. 94, 427 S.E.2d 695 (Ct.App.1993); *see also Garner v. Houck,* 312 S.C. 481, 435 S.E.2d 847 (1993) (failure to timely assert improper service waives any issue regarding its validity); *Republic Leasing Co. v. Haywood,* 329 S.C. 562, 495 S.E.2d 804 (Ct.App.1998) (lack of personal jurisdiction may always be waived). The family court was never asked to rule on whether service of the Rule to Show Cause was proper. Accordingly, Husband has waived this issue.

We note the better practice here would have been for the family court to appoint an agent for service when Husband's counsel was relieved. *See* Rule 4(e), SCRCP ("Whenever ... an order of court provides for service of a summons and complaint or of a notice, or an order upon a party not an inhabitant of or found within the State, service shall be made under the circumstances and in the manner prescribed by the ... order"). In the alternative, counsel should comply with

the Hague Service Convention when engaging in transnational domestic litigation.

### 4. *Valuation of marital property*

 Husband complains the family court valuation of the Hartig stock at $300,000 was without evidentiary support. We disagree.

The Hartig company invested in several Prague restaurants. The $300,000 valuation for Husband's Hartig stock is supported by Wife's testimony based on her opinion as follows:

> A: Because the business owns this set of restaurants and basically if I were a buyer coming in and I wanted to buy them what would be attractive to me is that they have the sites. I don't have to go out and find them and set them up. They have the employees and staff and they have the franchise, the name or brand awareness and anything else. So I just cannot imagine that somebody most likely would either be a wealthy Czech investor or a foreign investor would come in and buy seven restaurants in, you know, choice areas of Prague for less than say a million dollars or so and probably more than that. Um, these are somewhat the femoral (*sic*) values as any pricing is but I just, um— given my knowledge of turnover in these types of areas and that—that's the assessment I would make.

Her testimony further indicates she was familiar with Prague real estate generally and the Hartig restaurants in particular.

 Opinion testimony of a nonexpert who has sufficient knowledge of the value of the property in question or who has ample opportunity for forming a correct opinion of it is admissible. Whether a witness is properly qualified is a question primarily addressed to the sound discretion of the trial judge. *Newton v. Boggs*, 274 S.C. 268, 262 S.E.2d 741 (1980). Here, no objection was made to Wife's testimony. The evidence supports her qualification to testify regarding the valuation of Husband's interest in Hartig.

Further, Husband did not respond to Wife's request to admit that his interest in Hartig had a value of $300,000 and this fact is therefore deemed admitted under Rule 36(a), SCRCP. Although Husband complains this request to admit was not properly served in compliance with the Hague Evi-

dence Convention as discussed above, this issue was never raised to the family court and therefore is not preserved.

In conclusion, the family court's valuation of Husband's interest in Hartig is supported by the record.

### 5. Bench warrant

As part of the final December 21,1999, order, the family court found Husband in contempt for failure to make the June 1999 payment of $83,333 as required by the 1998 temporary order. In the December 21 order, the family court sentenced Husband to four months unless he purged himself by making the payment directly to Wife. As discussed above, Husband appealed this contempt finding on the ground service of the Rule to Show Cause was improper. That appeal was filed January 28, 2000.

Meanwhile, on January 26, 2000, a bench warrant was filed pursuant to the December 21 order. Husband subsequently obtained an order signed by Judge Smoak authorizing him to deposit $166,666 with the court in an interest-bearing account. This amount would cover two $83,333 payments—the June 1999 payment for which Husband was held in contempt, and the December 1999 payment which by then had become due.

Husband then moved before Judge Segars–Andrews to quash the bench warrant based on his deposit of funds with the court. By order filed November 27, 2000, Judge Segars–Andrews denied the motion finding the family court lacked jurisdiction since the contempt finding was on appeal. Husband moved for the same relief before Judge Armstrong. By order filed March 19, 2001, Judge Armstrong denied the motion to quash for the same reason given by Judge Segars–Andrews.

Husband contends Judge Armstrong erred in finding the family court had no jurisdiction to quash the bench warrant because of the pending appeal. We agree but find the motion to quash was properly denied.

An order of civil contempt is not automatically stayed on appeal. *In re Decker*, 322 S.C. 212, 471 S.E.2d 459 (1995). An order that is not automatically stayed remains enforceable while pending appeal unless the party seeks a stay. *See* Rule

225(c)(1), SCACR. The lower court has jurisdiction to determine a party's motion for a stay in the first instance. Rule 205, SCACR. Further, the lower court retains jurisdiction "over matters not affected by the appeal including the authority to enforce any matters not stayed." Rule 225(a), SCACR. Here, the continued viability of the bench warrant is a matter within the family court's authority to enforce its unstayed contempt order. The family court therefore retained jurisdiction to decide the merits of Husband's motion to quash.

In this case, however, Judge Armstrong could not overrule the prior order of Judge Segars–Andrews. *Charleston County Dept. of Soc. Servs. v. Father*, 317 S.C. 283, 454 S.E.2d 307 (1995). Judge Segars–Andrews's unappealed ruling finding no jurisdiction is therefore the law of the case. *In re Morrison*, 321 S.C. 370, 468 S.E.2d 651 (1996). Moreover, as discussed below, we find on the merits the motion to quash was properly denied.

### 6. Deposit of funds as purging contempt

 Husband contends his deposit of funds with the family court amounted to a purge of his contempt and therefore the bench warrant should have been quashed. We disagree.

First, the December 21 order specifically directed Husband to pay the outstanding $83,333 *directly* to Wife. Judge Smoak's order allowing the deposit of funds did not, and in fact could not, alter Judge Armstrong's prior order requiring that Husband pay Wife directly in order to purge himself of contempt.

 Further, Rule 67 may not be used as a means of altering the legal duties of the parties. *Renaissance Enterprises, Inc. v. Ocean Resorts, Inc.*, 334 S.C. 324, 513 S.E.2d 617 (1999). Where payment has been ordered and not appealed, and a contempt order is issued to compel payment, a deposit of funds under Rule 67 will not constitute a purge. Husband never contested the original order that he pay Wife from the proceeds of the sale of Patria stock and he remains legally obligated to make these payments to Wife. The deposit of uncontested funds with the court does nothing but delay

payment of funds that are legally due. This is not the intent of Rule 67.[5]

In conclusion, we find Husband did not purge himself of contempt by depositing the funds with the court and the motion to quash was properly denied. Further, in light of our affirmance of the contempt finding as discussed in Issue 3b above, we order the funds dispersed to Wife and, upon payment to Wife, the bench warrant shall be quashed.

### 7. Attorney's fees

■ In conjunction with his order denying Husband's motion to quash the bench warrant, by order filed April 30, 2001, Judge Armstrong awarded Wife's counsel attorneys' fees and costs—to Mr. Rosen, $2,500, and to Ms. Varner, $7,500. Husband contends these amounts are excessive and the judge failed to consider whether Wife could pay her own fees.

In support of the request for attorney's fees and costs, Mr. Rosen submitted an affidavit of $2,970 in fees and costs for defending Husband's motion to quash. Ms. Varner submitted an affidavit of $8,065.85. These amounts exceed the amounts awarded. There is no basis to find the fees awarded excessive as a matter of law.

■ Further, in awarding these fees, Judge Armstrong considered the factors set forth in *Glasscock v. Glasscock,* 304 S.C. 158, 403 S.E.2d 313 (1991). While noting the case was not "complex," Judge Armstrong emphasized that Husband had previously brought the same motion to quash which was denied by Judge Segars–Andrews. By bringing the same motion twice, Husband had forced Wife to expend these amounts in fees and costs. A claim for fees and costs may be properly awarded irrespective of whether the requesting party is financially able to pay where the litigation is unfounded. *Darden v. Witham,* 263 S.C. 183, 209 S.E.2d 42 (1974), *overruled in part on other grounds, Glasscock v. Glasscock, supra.*

In conclusion, the amount of fees and costs awarded is supported by the record and Judge Armstrong did not abuse

---

**5.** Husband's contention that he deposited the funds under Rule 67 to preserve his appeal of the contempt finding is unpersuasive. Husband could have sought a stay of that order to preserve his appeal.

his discretion in making the award. *Stevenson v. Stevenson*, 295 S.C. 412, 368 S.E.2d 901 (1988) (an award of attorney's fees will not be overturned absent an abuse of discretion).

### 8. Recrimination

The divorce decree was issued on December 22, 1999, granting Wife a divorce on the ground of Husband's adultery. One year later, on December 22, 2000, Husband filed a motion to vacate the decree under Rule 60(b), SCRCP, on the ground the evidence of Husband's adultery was fraudulent and Husband lacked notice of the November 1, 1999, hearing.[6] By order dated April 19, 2001, the family court denied the motion. Husband appeals that denial.

Husband contends the family court should have sua sponte dismissed Wife's complaint seeking a divorce on the ground of Husband's adultery because Wife's own admitted adultery amounted to recrimination. Recrimination is a defense to an action for divorce if the acts of recrimination charged constitute in themselves a ground for divorce. *Jeffords v. Jeffords*, 216 S.C. 451, 58 S.E.2d 731 (1950); *Allen v. Allen*, 287 S.C. 501, 339 S.E.2d 872 (Ct.App.1986). Although recrimination was never ruled on below,[7] Husband contends it is a jurisdictional issue and is therefore properly before us on appeal. This argument is without merit.

Husband raised the defense of recrimination in his answer. The fact that recrimination was pled, however, does not affect the family court's subject matter jurisdiction to enter a divorce decree. *See Dove v. Gold Kist, Inc.*, 314 S.C. 235, 442 S.E.2d 598 (1994) (subject matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings in question belong). Recrimination is not a jurisdictional issue and we decline to address it for the first time on appeal. *Smith v. Smith, supra.*

---

6. As discussed above, Husband was represented by counsel when this trial date was set. His claim of lack of notice is without merit.

7. The grounds for Husband's Rule 60(b) motion do not include recrimination and the order on appeal denying this motion does not address it. Further, Husband never presented evidence of Wife's admitted adultery at the final hearing.

Further, although in equitably dividing the marital estate the family court referred to Husband's marital misconduct, the court ultimately divided the marital assets 50/50. In light of the family court's finding that the parties started out equally and contributed jointly to the acquisition of assets, the equal division of property was not affected by the finding of Husband's fault.

## CONCLUSION

We conclude Husband's appeals are without merit. His decision to forego participation in the family court proceedings inevitably resulted in his failure to properly preserve for appeal any complaint regarding those proceedings. The orders of the family court are

**AFFIRMED.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.