714 S.E.2d 898

Marcus MOELLER, Respondent,

v.

Anna Brooke MOELLER, Appellant.

No. 4861.

Court of Appeals of South Carolina.

Heard June 8, 2011.

Decided Aug. 10, 2011.

Rehearing Denied Sept. 8, 2011.

William Norman Epps, III, of Anderson, for Appellant.

Christopher Lance Sheek, of Greenwood, for Respondent.

Adam S. Bacot, of Greenwood, for Guardian ad Litem.

PER CURIAM.

Appellant Anna Brooke Moeller (Mother) seeks review of the family court's award of child custody to Respondent Marcus Moeller (Father). Mother argues the family court placed an improper emphasis on her extra-marital affair when there was no evidence this relationship had any detrimental effect on the parties' children. Mother also argues the family court abused its discretion in separating Mother's oldest child from the parties' two younger children because the separation was against the children's best interests. We reverse and remand this matter to the family court for a custody exchange.

## FACTS/PROCEDURAL HISTORY

When the parties married in 2002, Mother had a ten-month-old daughter from a prior relationship. At that time, the parties lived in Mother's home in Anderson while Mother attended college. On March 8, 2003, a daughter was born of the marriage.

During the marriage, Father had difficulty maintaining stable employment. Mother worked at various jobs while she was in college and used her student loan proceeds to support the family. In August 2005, Mother began her teaching career in Anderson. In September 2005, Father began working in Greenwood. Mother agreed to move to Greenwood to reduce Father's commute time. On September 27, 2005, another daughter was born of the marriage.

The parties presented conflicting versions of their marital troubles and the timing of their separation. Mother complained about Father's tendency to cause their daughters to be late for school when he was assigned responsibility for their transportation. Mother also complained about Father's alleged drug use and emotional abuse of her throughout the marriage. On the other hand, Father complained about Mother's alleged uneven temperament and her emotional outbursts in front of the children.

According to Mother, she told Father in May 2007 that she wanted to leave the marital home. However, she did not reveal her plan to file for a divorce because she was afraid of his reaction. According to Father, the parties had discussed moving the whole family to Anderson because Mother was unhappy in Greenwood. Father believed their plan was for him to keep his job in Greenwood and commute from Anderson.

In July 2007, Mother met Russell Mullinax (Mullinax), with whom she later became romantically involved. In August 2007, Mother took the children, left the marital home in Greenwood, and moved into an apartment in Anderson. On August 2, 2007, Father learned Mother had not planned on him joining her in Anderson. When Father asked Mother for a key to the apartment she was leasing, she informed him that she considered them to be separated. She also suggested some time apart to see if it would help their relationship.

Approximately one week later, Father became suspicious Mother was having an affair. Mother had left an old cell phone at the marital home, and Father noticed that the phone continued to receive text messages. Several sexually explicit text messages were being delivered from the phone number belonging to Mullinax.[1] On August 27, 2007, Father filed a complaint seeking a divorce on the ground of adultery and custody of the parties' two daughters.[2] The family court

[1]. Mother testified that the text messages were part of a running joke and were not meant in a literal sense.

[2]. Although Father had considered adopting Mother's oldest daughter before the parties' separation, he has not sought custody of the child in this action.

granted temporary custody of the parties' daughters to Mother.

During the following several months, Mullinax bought a house in Anderson County, and Mother entered into an agreement with him to lease the house.[3] While the children were living in this home with Mother, they made several friends in school and in their neighborhood, and they became involved in multiple extracurricular activities, such as piano lessons and gymnastics. Mother was very involved with the children's school activities and extracurricular activities, and she stayed in contact with the children's teachers at least once a week. All three of Mother's children were very attached to one another. Father struggled financially during this time. As a result, the marital home became the subject of foreclosure proceedings.

At the final hearing, the guardian ad litem (GAL) indicated that the children's relationship with Mullinax was good. She also testified concerning her suspicions that Mother allowed Mullinax to stay overnight with her while the children were present.[4] The GAL hired a private investigator to conduct surveillance of Mother's residence during the night of April 23, 2009, through the following morning. The GAL also presented the private investigator as a witness.[5]

---

3. After Mother and her children moved into the house, Mullinax continued to list this residence on his driver's license, voter registration, and county tax assessment. However, both Mullinax and Mother insisted that he did not live there and that when he stayed in the home overnight, the children were away on visitation with Father. They also maintained that Mullinax, who worked from 6:30 p.m. to approximately 6:30 a.m., would stop by the house after he finished work to administer eye drops to Mother's large Weimaraner. Both claimed Mullinax stayed out of Mother's way while she was getting the children ready for school. They also claimed the children did not know Mullinax was at the home in the mornings.

4. Father admitted to his own post-separation adultery. However, little emphasis was placed on Father's romantic relationships during this .action.

5. The investigator testified that at 12:06 a.m. on April 24, 2009, he observed the grill of a Ford F–150, which is the type of vehicle Mullinax drove, in the back yard of Mother's residence. Shortly after 7:09 a.m., the investigator was able to photograph the truck behind the residence. The investigator also testified that he observed Mullinax's truck leaving

The GAL also testified that Mother was not forthcoming as to her relationship with Mullinax. The GAL stated it appeared that the children had been coached by Mother to say that Mullinax was not staying overnight at their home. The GAL expressed concern that Mother and her witnesses had gone to great lengths to deceive her about Mother's relationship with Mullinax and his presence around the children. The GAL indicated that Mother's behavior in this regard could negatively impact the children and their values. Although the GAL expressed concern over separating the children, she declined to make a recommendation as to child custody based on this factor alone.

The family court issued a final decree granting the parties a divorce on the ground of one year's separation and awarding custody of both children born of the marriage to Father. In its order, the family court found that the great lengths taken by Mother to deceive the GAL, the family court, and others about her relationship with Mullinax was "troublesome not only as to her credibility but also as to her lack of judgment, lack of mature reasoning, and ability to contrive and scheme for her own purposes." The family court expressed concern that the children were not "entirely open with the Guardian, as some of their responses appeared to have been given to protect the mother or coaxed by her." The family court also found that Mother "knowingly placed the children in the middle of her relationship with [Mullinax] and, by doing so, acted contrary to their best interests."

The family court denied Mother's motion for reconsideration. This appeal followed.

## ISSUES ON APPEAL

1. Did the family court place an improper emphasis on Mother's relationship with Mullinax when there was no evidence that this relationship had any detrimental effect on the parties' children?

2. Did the family court err in separating Mother's oldest child from the parties' two younger children when the

---

the neighborhood at 8:08 a.m. Mullinax's co-workers refuted the private investigator's placement of Mullinax at the house at 12:06 a.m. by placing him at his work location at that time.

separation was against the best interests of the children?

## STANDARD OF REVIEW

■ This court may review both factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *see also Nasser–Moghaddassi v. Moghaddassi*, 364 S.C. 182, 189, 612 S.E.2d 707, 711 (Ct.App.2005) ("In appeals from the family court, this Court may find facts in accordance with its own view of the preponderance of the evidence."). However, the court's broad scope of review does not relieve the appellant of the burden of proving to this court that the family court committed error. *Id.* at 190, 612 S.E.2d at 711; *see also Lewis v. Lewis*, 392 S.C. 381, 392, 709 S.E.2d 650, 655 (2011) (holding that the family court's factual findings will be affirmed unless the appellant satisfies this court that the preponderance of the evidence is against those findings).

## LAW/ANALYSIS

### I. Mother's conduct

■ Mother argues the family court placed an inappropriate emphasis on her relationship with Mullinax because there was no evidence the relationship had any detrimental effect on the parties' children. We agree.

■ In all child custody controversies, the controlling considerations are the child's welfare and best interests. *Cook v. Cobb*, 271 S.C. 136, 140, 245 S.E.2d 612, 614 (1978). In determining custody, the family court "must consider the character, fitness, attitude, and inclinations on the part of each parent *as they impact the child.*" *Woodall v. Woodall*, 322 S.C. 7, 11, 471 S.E.2d 154, 157 (1996) (emphasis added). Because all relevant factors must be taken into consideration, the family court should also review the "psychological, physical, environmental, spiritual, educational, medical, family, emotional and recreational aspects" of the child's life. *Id.* In other words, the totality of circumstances unique to each particular case "constitutes the only scale upon which the ultimate decision can be weighed." *Parris v. Parris*, 319 S.C. 308, 310, 460 S.E.2d 571, 572 (1995).

Here, rather than considering the totality of the circumstances unique to this case, the family court narrowly focused on (1) the GAL's speculation that Mother's perceived dishonesty would inevitably result in the children developing the same trait; and (2) the GAL's and Father's characterization of Mother as having an uneven temperament and overly emotional responses to everyday situations. Initially, we view as mere conjecture the GAL's testimony that she suspected the children had been coached by Mother to say Mullinax did not stay overnight at their house.

Even if the family court's perception of Mother's character traits is accurate, the record does not show that these traits have substantially affected the children's welfare.[6] Therefore, they cannot, by themselves, serve as a basis for denying Mother custody of her children. *See Davenport v. Davenport*, 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975) (holding that in a child custody dispute, a parent's morality is limited in its force to what relevancy it has to the welfare of the child); *see also Clear v. Clear*, 331 S.C. 186, 190, 500 S.E.2d 790, 792 (Ct.App. 1998) (stating that the record contained no evidence that a mother's topless dancing occupation adversely affected her ability to parent the parties' children and, thus, the mother's occupation was not relevant to the family court's custody decision); *Stroman v. Williams*, 291 S.C. 376, 380, 353 S.E.2d 704, 706 (Ct.App.1987) (holding that a child custody award may not be used to penalize or reward a parent for his or her conduct); *cf. Baer v. Baer*, 282 S.C. 362, 366, 318 S.E.2d 582, 584 (Ct.App.1984) ("A single act of misconduct by the custodial parent toward the noncustodial parent that does not substantially affect the children's welfare provides no basis for changing custody from one to the other."); *Stroman*, 291 S.C. at 379, 353 S.E.2d at 705 (noting that a father's claim that his child was "substantially affected" by the mother's lesbian relationship was not supported by any specific citation to the record and in fact there was nothing in the record showing that the child's welfare was being adversely affected in any substantial way); *Baer*, 282 S.C. at 365–66, 318 S.E.2d at 584 (holding that a mother's attempt to deceive the father as to where she and the parties' children were to be moving had no

6. Notably, counsel for Father conceded at oral argument that Mother's relationship with Mullinax did not harm the children.

significance in the family court's child custody determination because it in no way harmed the children).

Further, the family court overlooked the psychological, educational, emotional, and recreational aspects of the children's lives, such as school, neighborhood, and community ties as well as the traumatic effect of separating the two girls from their half-sister (see Issue II below). While in Mother's care, the children were well-adjusted in school, they had many friends from school and their neighborhood, they were involved in multiple extracurricular activities, and they enjoyed the companionship of their half-sister at home. Mother participated in the children's school activities and extracurricular activities, and she diligently attended to their medical needs. However, the family court did not address how a transfer of custody to Father would affect these positive aspects of the children's lives.

Moreover, the family court failed to address the precarious circumstances in which the children would find themselves under Father's care. By the time of the final hearing, Father's financial struggles resulted in the marital home becoming the subject of foreclosure proceedings. Neither Father nor the family court expressed concern for where the children would live in the event that Father could not prevent foreclosure on the marital home. Therefore, the children would face the threat of losing their home to foreclosure, with no plan for an alternative living arrangement. Counsel for Father conceded at oral argument that Father's lack of such a plan was troubling.

Additionally, we do not believe Father's lack of financial management skills is something that can be cured by child support payments to him from Mother, as was implied by Father in his testimony. The record reflects Father's trouble maintaining stable employment throughout the marriage and his continued reliance on Mother to pay for most of the children's expenses, including medical care and school expenses. Father's inability to provide financial stability for the children is a critical factor that the family court overlooked in determining child custody.

In sum, the family court placed an undue emphasis on Mother's relationship with Mullinax and her perceived decep-

tiveness regarding this relationship. The record demonstrates Mother's temporary custody of the girls provided a stable home environment for them and positively influenced their lives. The totality of the circumstances set forth in the record indicates that it was in the children's best interests to remain in Mother's custody because she is better able to take care of their needs. *See Parris,* 319 S.C. at 310, 460 S.E.2d at 572 (holding that the totality of circumstances unique to each particular case constitutes the only scale upon which the ultimate decision on child custody can be weighed). Therefore, Mother has carried her burden of proving the family court committed error in awarding custody to Father.

## II. Children's Separation

■ Mother maintains the family court erred in separating her oldest child from the parties' two younger children because the separation was against her children's best interests. We agree.

■■ Preserving sibling relationships is an important factor in determining the best interests of the children. *See Patel v. Patel,* 359 S.C. 515, 528–29, 599 S.E.2d 114, 121 (2004) ("[D]ivided custody should only be awarded where there are exceptional circumstances."); *In re Guardianship of BJO,* 165 P.3d 442, 446 (Wyo.2007) (noting the importance of keeping siblings together and holding that the strong public policy toward preservation of sibling relationships is equally applicable whether the children are full siblings, half-siblings, or step-siblings); *id.* at 445 (requiring trial court to be explicit in placing on the record the reasons supporting its determination to separate siblings so as to assure that a comprehensive evaluation of all relevant factors occurred prior to the award of custody). The separation of siblings should be avoided unless there are "exceptional circumstances" present:

Divided custody (also known as split custody) is disfavored because it separates siblings by giving each parent physical custody of one or more of the children. It cannot be awarded absent exceptional circumstances, such as a high level of conflict/hostility between children or the inability of one parent to care for all the children. A forced separation

from their siblings can have a traumatic impact on children whose lives are already disrupted by the divorce experience. Roy T. Stuckey, *Marital Litigation in South Carolina* 465 (4th ed.2010).

Here, the separation of the half-sisters is troubling. Equally troubling is the fact that the family court did not address this separation in its order. We find no exceptional circumstances in the record that require the separation of the parties' children from their half-sister. Further, Father did not adopt Mother's oldest child when he had the opportunity to do so. As a result, he found himself in a position unfavorable to seeking custody of this child. Therefore, it was in the best interest of all three children to stay in Mother's care.

Based on the foregoing, Mother has carried her burden of convincing this court that the family court erred in separating the parties' children from their half-sister.

## CONCLUSION

Accordingly, the family court's child custody award is **REVERSED** and the case is **REMANDED** for the entry of an order requiring a custody exchange to occur as soon as practicable.

SHORT, WILLIAMS, and GEATHERS, JJ., concur.