THIS OPINION
 HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN
 ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 James and Diane
 Youngblood, Respondents/Appellants,
 
 
 

v.

 
 
 
 South Carolina
 Department of Social Services, Defendant,
 
 
 

v.

 
 
 
 Jane and John
 Doe, Intervenors,
 Of whom Jane
 and John Doe are the, Appellants/Respondents.
 
 
 

Appeal From Pickens County
W. Marsh Robertson, Family Court Judge

Unpublished Opinion No. 2012-UP-172   
 Heard February 7, 2012  Filed March 8,
2012

AFFIRMED IN PART, REVERSED IN PART, AND
 REMANDED

 
 
 
 Vanessa H. Kormylo, of Greenville, for Appellant-Respondents.
 Sarah Ganss Drawdy, of Anderson, for Respondent-Appellants.
 Steven L. Alexander, of Pickens, for Guardian
 ad Litem.
 
 
 

PER CURIAM:  John
 and Jane Doe and James and Diane Youngblood cross-appeal the family court's
 final order granting the adoption of Child to the Youngbloods and requiring
 visitation with Child's biological siblings, who were adopted by the Does.  The
 Does argue the family court erred in (1) holding the Youngbloods had standing
 to adopt Child, (2) granting the adoption without the consent of the South
 Carolina Department of Social Services (DSS), and (3) finding Child's adoption
 by the Youngbloods was in her best interests.  The Youngbloods argue the family
 court erred in (1) granting visitation and (2) finding they were not entitled
 to attorney's fees.  We affirm
 in part, reverse in part, and remand for further proceedings consistent with
 this opinion.
FACTS AND PROCEDURAL HISTORY
DSS removed Child, who was
 born in February 2006, and her four older siblings from the custody of their
 biological parents.  While an action to terminate her biological parents'
 parental rights was pending, DSS placed her in a foster home for several months
 and then transferred her to the foster care of the Youngbloods on October 12,
 2007.  Although separated, the siblings visited each other from time to time
 during their foster care.
On April 17, 2008, the
 Youngbloods received a letter from DSS informing them that adoption was Child's
 permanent care plan.  DSS gave the Youngbloods ninety days to seek a home study
 if they desired to be considered as candidates for Child's adoption.  The
 letter also notified them that Child "may be moved for the purposes of
 adoption once an approved resource has been identified," and "it will
 be the first priority of [DSS] to reunite and place [Child with her siblings]
 for the purpose of adoption."  The Youngbloods timely submitted the
 materials to DSS for a home study.
DSS notified the Youngbloods
 on March 17, 2009, that their home study was approved but Child and her
 siblings would be placed together with the Does, who had indicated to DSS in
 January 2009 that they were interested in adopting all five siblings.  Ten days'
 notice of removal was given on May 5, 2009, and the children were removed and placed
 in the Does' custody for the purpose of adoption that June.  The Youngbloods
 challenged Child's removal, seeking a fair hearing from a DSS committee.[1] 
 However, the Youngbloods filed a petition with the family court to adopt Child
 before their administrative appeal was decided.  The Does responded with a
 formal petition of their own, seeking the adoption of all five siblings.[2]
The family court, in a
 temporary order issued following a July 29 hearing, granted the Youngbloods immediate
 custody of Child during the pendency of the adoption proceedings.  The
 temporary order also required reasonable visitation between Child and her
 siblings and denied DSS's motion to dismiss the petition due to the
 Youngbloods' failure to exhaust their available administrative remedies.  The
 family court issued a second temporary order a few months later, which ordered
 mediation, bonding assessments, and discovery, and detailed a plan for
 visitation during the pendency of the proceedings.
A final hearing on the
 adoption was held before the family court in September 2010.  Dr. Mary Cumming,
 a family counselor retained by the guardian ad litem[3] (GAL) for a bonding assessment, testified in favor of adoption by the
 Youngbloods.  After conducting four visits with the Youngbloods and one with
 the Does, Dr. Cumming recommended that Child not be removed from the
 Youngbloods' home because she was doing well in a "fragile and important
 part of development."  She emphasized, however, that Child would learn a
 lot from both families and that both families loved Child.  Other concerns of
 Dr. Cumming were that Child "seemed exhausted" from her interactions
 with the Does, and the Does' "chaotically enmeshed" family system
 faced huge challenges with the responsibilities they had taken on.  Given Child's
 strong temperament, Dr. Cumming opined the structure and space provided by the
 Youngbloods would better suit her.
Also testifying in favor of
 adoption by the Youngbloods was Dr. David Cannon, a clinical psychologist, who
 was involved in the proceedings to terminate Child's biological parents'
 parental rights.  He appeared under subpoena issued by the Youngbloods.  Dr.
 Cannon noted he never assessed the families for the purposes of the adoption
 proceedings, and he had no detailed knowledge of the families.  His opinion,
 however, was that removing Child from the Youngbloods' home and uniting her
 with her siblings was not worth the risk.  He viewed this case as "one of
 those cases where [a] child is obviously . . . better off left in the location
 she regards as her home and with the people she regards as her parents and has
 obviously bonded with."
In addition to recommending
 that Child remain with the Youngbloods, Drs. Cumming and Cannon both
 recommended sibling visitation.  Dr. Cumming concluded that Child
 "should have free and liberal visitation" with flexibility in the
 schedule "as she grows older."  She emphasized it would be
 detrimental for Child to no longer have a relationship with her siblings.  Dr.
 Cannon did not "see the logic behind" placing the Child with the
 Does, "especially if there [were] arrangements for [Child] to have regular
 visitation with [her] four other siblings."
Dr. Deborah Otto-Sunderman, a
 counselor the Youngbloods hired for Child, also testified for the Youngbloods. 
 After observing Child routinely, Dr. Otto-Sunderman's overall recommendation was
 that removal from the Youngbloods' home and adoption by the Does would be a great
 risk because of Child's secure primary care attachment with the Youngbloods.  Thus,
 adoption by the Youngbloods, she testified, was in Child's best interests.
The Does retained two
 experts, Meredith Thompson-Loftis and Dr. Craig Horn, to testify at the
 hearing.  Thompson-Loftis, a counselor who observed Child and her siblings and
 assessed the sibling bond, explained "a lot of research [showed] that the
 sibling bond is almost equal to if not greater than that of a parental
 bond" but noted her opinion that "it's more of on a case by case
 basis."  She concluded Child had "multiple bonds at the primary
 status," including the bond with her siblings.  Her recommendation was
 that Child needed to be with her siblings.  Dr. Horn, a clinical psychologist,
 gave similar testimony although he never had contact with the parties
 involved.  After reviewing documents provided to him, he pointed out that young
 children like Child had the ability to adjust and children placed together had
 fewer emotional behavioral problems, especially when their biological parents
 are no longer present.  He explained removing Child from the Youngbloods' home
 would not create a risk for attachment disorder.
Finally, the GAL and DSS
 officials testified.  The GAL presented his report and opinion regarding Child's
 best interests, recommending Child be adopted by the Does.  The GAL was
 concerned about the "antagonistic relationship and pending law suit
 between the prospective parents."  But in the event the family court found
 in favor of the Youngbloods, the GAL recommended sibling visitation.  Helena
 Turner, who sat on the DSS committee that placed the siblings with the Does,
 testified the committee determined Child's interests were best served by her
 placement with her siblings and searched for a "family for them to
 transition into."  She noted it was also DSS policy to do so.  Deborah
 Thompson, another committee member, explained that DSS would not have placed Child
 with the Does if they were concerned she would not "successfully
 transition[] into a placement with her siblings."
The Youngbloods also
 introduced evidence of the Does' teenage son's Facebook profile.  On his
 profile were the results of many quizzes, some designed to identify historical
 figures he was most similar to, including the dictator Adolf Hitler, the
 assassin Gavrilo Princip, and the serial killer Herbert Mullin.  The
 Youngbloods communicated their concerns about the Facebook profile to DSS, but
 neither the GAL nor DSS, after an investigation, were troubled by the
 postings.  The Does filed a slander lawsuit, claiming Mrs. Youngblood called their
 son a sex predator and a Nazi.  Furthermore, the Does challenged the relevancy of
 the postings at the hearing; however, the family court overruled their
 objection.  The family court asked the Does' son at the final hearing if he had
 removed the postings, and he had not.  Nevertheless, the family court found his
 explanation for the postings to be "plausible and palatable."
In its final order, the
 family court found the Youngbloods had standing to adopt, noting that the
 Youngbloods had informed DSS of their desire to adopt Child, obtained approval
 to adopt generally, and properly challenged Child's removal from their
 custody.  It pointed out that the foster care contract did not voluntarily end.
As to the adoption of Child,
 the family court concluded as follows:

 I have
 carefully considered all evidence presented.  I am cognizant of the legal
 presumption in favor of keeping siblings together, and I agree with that policy
 in most cases.  This is not, however, a typical case.  I have weighed the pros
 and cons of allowing [Child] to grow up in the same home as her brothers and
 sisters.  I have likewise weighed the benefits of allowing her to remain in her
 current home with her current parental figures verses the potential harm to her
 if she is permanently removed from [the Youngbloods' care].  In the final
 analysis, I am persuaded that adoption by [the Youngbloods] is in [Child's]
 best interest and welfare, both from a near-term and long-term perspective.

The family court placed the
 greatest weight on the testimony of Drs. Cumming and Cannon, who both
 recommended that Child remain with the Youngbloods.  In determining which
 family would better serve Child's best interests, the family court also
 referred to the Does' "lack of sound parental judgment in handling [the]
 matter," which included the slander lawsuit.
Although the adoption was
 decided in favor of the Youngbloods, the family court, pursuant to section
 63-3-530(A)(44) of the South Carolina Code (2010), found continued visitation
 "with the Doe family" was in the best interests of all siblings,
 including Child.  The court-ordered schedule included visitation every other
 weekend, every other spring break, every other Thanksgiving break, and the
 second half of every Christmas break, dividing Christmas Day.  Finally, the
 family court found that neither the Youngbloods nor the Does "should be
 ordered to pay or contribute to the attorney's fees and costs of the
 other"; however, the Does were ordered to pay 67% of the GAL's attorney's
 fees, while the Youngbloods were responsible for the remainder.  The family
 court denied both the Youngbloods' and the Does' motions for reconsideration;
 however, it corrected its order pursuant to Rule 60(a), SCRCP, amending the
 order to give the Does three full weeks of visitation during the summer, compared
 to the Youngbloods' two full weeks.  This cross-appeal followed.
STANDARD OF REVIEW
On appeal from the family
 court, this court reviews factual and legal issues de novo.  Simmons v.
 Simmons, 399 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); see also Lewis
 v. Lewis, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011).  An appellate
 court "has the authority to find the facts in accordance with its view of
 the preponderance of the evidence" and is not required "to disregard
 the findings of the family court."  Ex parte Morris, 367 S.C. 56,
 61, 624 S.E.2d 649, 652 (2006).  We recognize the family court, which saw and
 heard the witnesses, was in a better position to evaluate their credibility and
 assign comparative weight to their testimony.  Lewis, 392 S.C. at 385,
 709 S.E.2d at 652.  Thus, the burden is upon the appellant to convince this
 court that the family court erred in its findings.  Id.  "This
 degree of deference is especially true in cases involving the welfare and best
 interests of a minor child."  Ex parte Morris, 367 S.C. at 62, 624
 S.E.2d at 652.
LAW/ANALYSIS
I.  Standing and Consent
The Does argue
 the Youngbloods lack standing to petition the family court for the adoption of
 Child.  Furthermore, the Does contend DSS's consent to adopt, which the Youngbloods
 did not have, was required by law.  We disagree.
A.  Standing
"Any South
 Carolina resident may petition the [family] court to adopt a child."  S.C.
 Code Ann. § 63-9-60(A)(1) (Supp. 2011).  This
 provision is limited, however, once a child is "placed by DSS in another
 home for the purposes of adoption."  Michael P. v. Greenville Cnty.
 Dep't of Soc. Servs., 385 S.C. 407, 415, 684 S.E.2d 211, 215 (Ct. App.
 2009) (citing S.C. Code Ann. § 63-9-60(B) (2010)).  After a child is
 placed in a pre-adoptive home, a former foster parent, in order to maintain
 standing to intervene, must show he suffered an injury-in-fact that is
 concrete, particularized, actual, and imminent; that is causally connected to
 the conduct of DSS; and that will likely "be redressed by a favorable
 decision."  Id. at 416, 684 S.E.2d at 215.  Because Child was
 placed with the Does by DSS for adoption, we find the Youngbloods were former
 foster parents when they petitioned the family court for adoption, and the
 broad window to petition the family court under section 63-9-60(A)(1) had
 closed.  However, this does not end our analysis.
In Michael P.,
 this court considered the standing of former foster parents who intervened in
 an adoption after the child was placed in a pre-adoptive home.  Michael P.,
 385 S.C. at 410, 684 S.E.2d at 212-13.  Although this court generally noted
 that "foster parents' procedural and due process rights . . . are more
 limited than the rights of legal parents," we never addressed precisely
 what those rights were, finding only that "[a]ny rights [the former foster
 parents] had with regard to [the child] ended after they chose not to
 administratively challenge the removal of [the child] from their care."  Id. at 416-18, 684 S.E.2d at 215-17.  The Youngbloods, however, administratively challenged
 Child's removal from their home and requested to adopt Child before DSS found a
 home willing to adopt the sibling group.  Without evidence of a waiver, we must
 determine, unlike in Michael P., what legal interest the Youngbloods had
 in petitioning to adopt once Child was placed with the Does.  We find, given
 the unique facts of this case, that DSS's denial of consent gives the
 Youngbloods the standing to petition the family court for Child's adoption.
B.  Consent
The consent of
 DSS, or any child-placing agency, is required when the "authority to
 execute a consent or relinquishment has been vested legally in" it after
 "the parental rights of both the [child's] parents have been judicially
 terminated."  S.C. Code Ann. § 63-9-310(B) (2010); see also S.C. Code Ann. §
 63-9-750(B)(2) (2010) (providing that the family court has the duty to find
 that "all necessary consents or relinquishments for the purpose of
 adoption have been obtained").  When a child-placing agency does not provide its consent to a
 person eligible under section 63-9-60, it has "an affirmative duty to
 inform the person who is denied consent of all of his rights for judicial
 review of the denial."  S.C. Code Ann. § 63-9-310(D) (2010). 
 Therefore, reading the plain language of section 63-9-310(D), we find that any
 person who is initially eligible to adopt under section 63-9-60 and who is aggrieved
 by a child-placing agency's decision to deny them consent to adopt a specific
 child may petition the family court to review the child-placing agency's
 decision in order to determine whether it was in the child's best interests.  See,
 e.g., Michael P., 385 S.C. at 414-15, 684 S.E.2d at 215
 ("Whenever possible, legislative intent should be found in the plain
 language of the statute itself.").
However, the
 denial of consent and the mere failure to obtain consent, as was the case in Michael
 P., require some distinction.  Indeed, no foster parent, whose rights are
 defined by contract, has a right to adopt a specific child in the legal custody
 of a child-placing agency.  Michael P., accordingly, presents an example
 of how the limited legal rights of a foster parent can be waived if the foster
 parent declines a child-placing agency's invitation to apply for a home study or
 fails to administratively challenge the child's removal.  Our holding is
 limited to the recognition of the statutory right of a "person who is
 denied consent" of a child-placing agency to petition the family court
 "for judicial review of the denial."  S.C. Code Ann. § 63-9-310(D) (2010).  In addition to deciding whether consent was
 in fact denied, the family court must determine what best serves the interests
 of the child and whether consent was properly obtained.  See S.C. Code
 Ann. § 63-9-750(B) (2010)
 (detailing the findings the family court must make in granting an adoption
 after a final hearing).  
The denial of
 consent by a child-placing agency assumes a timely application for the adoption
 of a specific child by an eligible family.  When the Youngbloods applied to
 adopt Child, they were residents of South Carolina and Child had not been
 placed for the purpose of adoption.  Moreover, by DSS's own admission, the
 Youngbloods properly applied to adopt Child but were denied consent because
 "the sibling group of five [was] placed together."  Aggrieved by
 DSS's decision and without an administrative remedy, the Youngbloods properly
 sought review by the family court, pleading in their petition that DSS's
 determination was not in the best interests of Child and seeking the protection
 of the family court.  See 27 S.C. Code Ann. Regs. 114-150(A)(2) (Supp.
 2011) ("A person is not entitled to appeal [DSS's] decision to deny its
 consent or refuse approval of the applicant for adoption of a
 specific child.").
Resolution and
 permanency are crucial in determining the best interests of a child in the
 adoption context, and the role of a child-placing agency in making that
 determination should not be ignored or even diminished.  Michael P., 385 S.C at 417, 684 S.E.2d at 216 ("A child deserves resolution and permanency in his or her
 life.") (quoting In re Michael Ray T., 525 S.E.2d 315, 323 (W. Va. 1999)).  But in the rare instances when an adoption is contested, we
 hold the family court has the authority to review the agency's decision
 regarding consent.  Judicial review will ensure that the decision is in the
 best interests of the child and not arbitrary.  Accordingly, we find the
 Youngbloods had standing to petition the family court for Child's adoption.
II.  Child's Best Interests
Both the Does and
 the Youngbloods challenge the family court's determination of Child's best
 interests.  Specifically, the Does argue the adoption by the Youngbloods was
 not in Child's best interests, and the Youngbloods object to the scope of the family
 court's grant of sibling visitation.  Like
 the family court, we recognize Child's interests are best served in maintaining
 the relationships she developed over her young life; however, we agree with the
 Youngbloods that the family court's broad grant of sibling visitation was
 inconsistent with the evidence presented at the hearing.
In adjudicating a
 contested adoption, the family court must determine whether the child-placing
 agency's consent was properly obtaineda duty intertwined, as we noted above,
 with the paramount task of finding whether "the best interests of the
 adoptee are served by the adoption."  S.C. Code Ann. § 63-9-750(B)(6) (2010).  Here, the family court found that
 adoption by the Youngbloods best served Child's interests, and considering that
 the family court is in the best position to make credibility determinations, we
 affirm.  Indeed, the testimony of both Drs. Cumming and Cannon, which the
 family court found most credible and weighed heavily, supports Child's adoption
 by the Youngbloods.  Both experts concluded Child was in a fragile period of
 her development and removal from the Youngbloods' home would pose a risk to her,
 and all experts, including the Does', acknowledged the existence of a bond between
 the Youngbloods and Child.
It follows that placing
 Child with the Does would sever a bond that was developed over a substantial
 period of Child's life.  The Youngbloods and Child would not be entitled under
 law to maintain their relationship, and each would be dependent on the
 discretion of the Doesa legitimate risk given the relationship between the two
 families that was observed by the GAL.  Thus, from our "review [of] the
 cold record," we find the Does fail to meet their burden of convincing
 this court, by a preponderance of the evidence, that the family court erred in
 finding adoption by the Youngbloods was in Child's best interests.  Altman v. Griffith, 372 S.C. 388, 393, 642 S.E.2d 619, 622 (Ct. App. 2007).
We, like the family
 court, are mindful of the Does' contention that "the policy of this State [is]
 to reunite [a] child with [her] family in a timely manner, whether or not [she]
 has been placed in the care of the State voluntarily."  S.C. Code Ann. § 63-1-20(D) (2010).  Moreover, we recently held the separation of
 siblings in custody disputes "should be avoided unless there are exceptional
 circumstances present."  Moeller v. Moeller, 394 S.C. 365, 374, 714
 S.E.2d 898, 903 (Ct. App. 2011) (internal quotation marks omitted).  In Moeller,
 we found no exceptional circumstances to support the separation of two children
 from their half-sibling.  Id. at 375, 714 S.E.2d at 903.  That case,
 however, was a custody case between two biological parents, and the father did
 not risk losing visitation after we found the mother was entitled to custody.  Id.; see also Patel v.
 Patel, 359 S.C. 515,
 528-29, 599 S.E.2d 114, 121 (2004) (finding that separating siblings in order
 for one to complete high school in another state was not an abuse of
 discretion).  By accepting
 the testimony of Drs. Cumming and Cannon, we must also defer to the family
 court's finding that "[t]his is not . . . a typical case."  The risk
 of completely severing a key relationship in Child's life is an exceptional
 circumstance to consider.  Thus, we affirm the family court's decision that
 adoption by the Youngbloods was in Child's best interests.
The Youngbloods,
 however, contend that the family court erred in determining the schedule of
 sibling visitation.[4] 
 Their exception to the visitation schedule regards its scope, and they point
 out the order's reference to the Doe family as a whole and its grant of a significant
 amount of time when Child will be apart from a legal parent.  These arguments,
 however, were never raised to the family court before its ruling.  In fact, the
 Youngbloods, who proposed no schedule, indicated during the final hearing that
 they were willing to accept sibling visitation as a condition if they were
 granted the adoption.  Moreover, the record does not show whether the
 visitation schedule was challenged by the Youngbloods until their motion for
 reconsideration.  Thus, we find the issues raised by the Youngbloods are not
 preserved for our review.  See I'On, L.L.C. v. Town of Mt. Pleasant, 338 S.C.
 406, 422, 526 S.E.2d 716, 724 (2000) (noting the preservation rules exist
 "to enable the lower court to rule properly after it has considered all
 relevant facts, law, and arguments").
This court cannot
 ignore the best interests of Child.  Our standard of review in appeals from the
 family court requires a de novo review of the family court's decision, and appellate
 courts are consistent in holding that "procedural rules are subservient to
 the court's duty to zealously guard the rights of minors."  Joiner v. Rivas,
 342 S.C. 102, 107, 536 S.E.2d 372, 374 (2000).  Despite the Youngbloods'
 failure to properly raise their objections to the family court, we are compelled
 on review to assess the family court's order in light of the record as a whole,
 and we find the visitation schedule, as ordered, is not supported by evidence.
The temporary
 orders of the family court show an evolution of the visitation schedule early
 in the litigation.  The family court first ordered "reasonable
 visitation" between Child and her siblings but later established a
 specific schedule, finding a definite schedule necessary because of the
 strained relationship between the Youngbloods and the Does.  The follow-up
 order included visitation for three Saturdays a month until the end of 2009, as
 well as five hours on Christmas Day.  The schedule shifted to visitation every
 other weekend beginning January 1, 2010, and that frequency was continued throughout
 the proceedings.  Thus, relevant to visitation, the only evidence before the
 family court at the hearing was the temporary schedule, as well as the
 testimony of the experts that visitation generally was in Child's best
 interests if the adoption was granted in the Youngbloods' favor.
In light of the
 expert testimony, we find a preponderance of the evidence proves that sibling
 visitation is in the best interests of Child; however, the evidence supporting
 the specific schedule is insufficient.  The schedule established in the final
 order significantly expanded visitation to include entire holiday breaks and
 multiple summer weeks, but no testimony or proposal showed that schedule was appropriate. 
 Because we are unable to make an adequate determination of how Child's best
 interests are affected by the frequency of visitation, we reverse the family
 court's schedule.  We remand the matter for an evidentiary hearing solely to
 determine the proper scope of sibling visitation.
III. Attorney's Fees
The Youngbloods
 contend the family court erred in denying their motion for attorney's fees and
 in ordering them to pay one-third of the GAL's attorney's fees because they
 prevailed on the merits.  We disagree.
The authority for
 a family court to award attorney's fees must be found in a statute, and two statutes enable the family court's authority
 in the adoption context.  See, e.g., Baxter
 v. Martin Bros., Inc., 368 S.C. 510, 514, 630 S.E.2d 42, 44 (2006)  First, the family court may generally
 assess attorney's fees "for or
 against a party to an action brought in or subject to the jurisdiction of the
 family court."  S.C. Code Ann. § 63-3-530(A)(38) (2010).  A party,
 however, must request the attorney's fees in a pleading or a motion for pendente
 lite relief.  Id.  Second, the adoption statutes specifically authorize the payment of attorney's
 fees in adoption proceedings to a child-placing agency or person as long as the
 fees are not provided as "consideration for giving a consent or
 relinquishment of a child for the purpose of adoption."  S.C. Code Ann. § 63-9-310(F) (2010).  Although the more specific statute generally
 controls, the contested nature of this action presents a unique set of facts,
 adding an element of judicial review to a statutorily-defined adoption procedure. 
 We hold, therefore, that section 63-3-530(A)(38) gives the family court the
 discretion to award attorney's fees if the parties properly requested them.[5]  Patel v. Patel, 359 S.C. 515,
 533, 599 S.E.2d 114, 123 (2004) ("An award of attorney's fees rests within
 the sound discretion of the [family court] and should not be disturbed on
 appeal unless there is an abuse of discretion.").
Given the applicability of
 section 63-3-530(A)(38), the family court, in deciding whether to award
 attorney's fees, should consider "(1) the party's ability to pay his/her
 own attorney's fee; (2) [the] beneficial results obtained by the attorney; (3)
 the parties' respective financial conditions; [and] (4) [the] effect of the
 attorney's fee on each party's standard of living."  E.D.M. v. T.A.M.,
 307 S.C. 471, 476-77, 415 S.E.2d 812, 816 (1992) (citing Glasscock v.
 Glasscock, 304 S.C. 158, 161 n.1, 403 S.E.2d 313, 315 n.1 (1991)).  We find
 the family court properly exercised its discretion in declining to award
 attorney's fees to the Youngbloods.  The family court's analysis, which
 included consideration of each of the E.D.M. factors, is supported by the
 evidence of the Youngbloods' financial standing compared to the fees and costs billed
 by their attorney.  Although the Youngbloods have less income than the Does, Child
 is the only minor child in the Youngbloods' care.  Moreover, the Does' attorney
 submitted an affidavit of fees and costs totaling $36,377.29.  An additional
 $19,910.00 would substantially affect the standard of living for a family with
 five minor children and who are routinely visited by Child.  Given this
 evidence and the deference we give in reviewing the decisions made within a
 family court's discretion, the beneficial results obtained by the Youngbloods'
 attorney do not require a reversal.
The Youngbloods
 also argue the family court erred in requiring them to pay one-third of the
 GAL's attorney's fees.  The compensation of a GAL, including the payment of any
 attorney's fees, is authorized by a separate statutory scheme.  See S.C.
 Code Ann. § 63-9-310(F)(4) (2010) (providing for the
 compensation of GALs in adoptions); S.C. Code Ann. § 63-9-720 (2010) (providing for GALs
 in adoptions); S.C. Code Ann. §§ 63-3-810
 to -870 (2010) (governing the appointment and compensation of GALs in
 private actions).  Although
 the family court divided the GAL fees between the Youngbloods and the Does, it
 is unclear from the record on appeal how the issue was raised.  The record fails
 to even imply the Youngbloods challenged the issue before the family court, and
 they did not move for the family court to alter or amend the final order on the
 issue.  Thus, the issue is not preserved for this court's review.  See, e.g., Doe v. Doe, 370 S.C. 206, 217, 634 S.E.2d 51, 57 (Ct. App. 2006)
 (finding that an issue not raised to the family court was not preserved for
 appellate review).
CONCLUSION
Based on the
 foregoing, the decision of the family court is
AFFIRMED IN
 PART, REVERSED IN PART, AND REMANDED.
SHORT,
 WILLIAMS, and GEATHERS, JJ., concur.

[1] The Youngbloods' appeal of the removal was ultimately
 decided in DSS's favor after the fair hearing committee found that the
 Youngbloods were afforded due process.  No evidence shows the fair hearing
 committee's decision was appealed to the Administrative Law Court.
[2] The uncontested adoption of Child's four siblings, to
 which DSS consented, was granted on May 4, 2010.  The Does' petition to adopt
 Child was consolidated with the Youngbloods' petition, and the Does were
 designated as intervenors.
[3] The GAL was appointed on September 18, 2007, in the
 wake of the siblings' removal from their biological parents' home.  The family
 court ordered the GAL to stay on during the adoption proceedings.
[4] Although
 the family court has the authority to grant sibling visitation, we note no
 South Carolina appellate court has addressed the specific issue of a family
 court's authority to order visitation between a child and her biological
 siblings when their legal relationship is severed by an adoption.  S.C. Code Ann. § 63-3-530(A)(44)
 (2010) (effective May 27, 1998).  We decline to address that authority here when the issue was neither
 disputed in the proceedings before the family court nor raised on review.  See,
 e.g., Doe v. Doe, 370 S.C. 206, 217, 634 S.E.2d 51, 57 (Ct. App.
 2006) (finding that an issue not raised to the family court was not preserved
 for appellate review); Bakala v. Bakala, 352 S.C. 612, 632, 576 S.E.2d
 156, 166 (2003) (reiterating that rulings that are not appealed are the law of
 the case).  
[5] We note the only evidence in the record showing that
 the parties requested attorney's fees from each other was a reference in the
 family court's final order.  The petition for adoption filed by the Youngbloods
 requested attorney's fees against DSS, not the Does.  However, because neither
 side appeals the family court's discretion to award attorney's fees, we decline
 to address whether they were properly requested.