495 S.E.2d 236

**Felicia WATSON, Appellant–Respondent,**

v.

**Angus POOLE, Respondent–Appellant.**

**No. 2768.**

Court of Appeals of South Carolina.

Heard Oct. 9, 1997.

Decided Dec. 15, 1997.

Rehearing Denied Jan. 23, 1998.

Randall K. Mullins, North Myrtle Beach, for appellant-respondent.

James M. Saleeby and Mary Layton Wells, Florence, for respondent-appellant.

Guardian ad Litem Frederick A. Hoefer, II, of Harwell, Ballenger, DeBerry, Barth & Hoefer, of Florence.

HEARN, Judge:

These cross-appeals arise from a child custody and visitation dispute between Felicia Watson (Mother) and Angus Poole (Father). The family court's final order provided that custody remain with Mother, that Father continue his visitation rights, and that Mother pay $2,000 in attorney fees and $1,000 in Guardian *ad Litem* fees. We affirm as modified in part, reverse in part, and remand.

## I. FACTS

Mother initiated this action in February 1996 seeking to terminate or restrict Father's visitation rights, alleging he had sexually abused their four-year-old daughter, Anne Marie. Father answered and counterclaimed, denying the allegations and seeking a transfer of custody to him.

The parties separated in 1993. The initial temporary order awarded Father only daytime visitation because Mother was still nursing Anne Marie, then age eleven months. Thereafter, by final order of separate maintenance dated September 7, 1993, Father was awarded standard overnight visitation. After Father's first overnight visitation with Anne Marie pursuant to that order, Mother allegedly noticed a redness in the child's genital area, took the child to a pediatrician for an examination and reported the matter to the South Carolina Department of Social Services (SCDSS). At that time, Anne Marie was one year old. Mother had Anne Marie examined by Dr. Susan Breeland in Columbia and four additional times by her local pediatrician.[1] A second report of sexual abuse was made to SCDSS in December 1993, and in January 1994 the child was examined a second time by Dr. Breeland. Once again there was no physical evidence of sexual abuse. In the divorce decree dated May 27, 1994, the court, while noting Mother's reluctance to accept the findings of medical professionals, awarded custody to her and overnight visitation to Father.

Since the divorce, Mother has continued to accuse Father of sexually abusing their daughter. She has subjected the child to additional physical examinations, none of which indicated any evidence of abuse. She also subjected the child to intensive psychological counseling by several mental health professionals, social workers, SCDSS caseworkers, friends, and relatives.[2] Mother admitted at trial that at least ten findings had been made that Father never harmed the child, including one by the family court judge who made the original custody and visitation award. Mother also conceded that she had never wanted Father to have overnight visitation.

From this battery of examinations and interrogations, the only evidence of sexual abuse presented at trial was that the

---

1. Although the child's local physician, Dr. Traynham, gave Mother a letter in 1993 stating he suspected sexual abuse, there was no physical evidence of abuse.

2. One of these examinations included an encounter between Anne Marie and Michele York, a client of Mother's, whereby both the child and Ms. York disrobed and engaged in some type of role-playing in a room alone at Mother's house. The Guardian *ad Litem*, Frederick A. Hoefer, II, reported this incident to SCDSS.

child (1) masturbates in Mother's presence, (2) expresses an interest in male and female genitalia, (3) demonstrates sexual conduct with anatomical dolls, and (4) describes at times sexual contact between herself, her father, and a man named "John Watson."[3] This evidence came from one counselor who ultimately determined Father had not abused Anne Marie[4] and from another counselor who expressed concern over the child's behavior but could not determine if Father was responsible in any way. In addition, the Guardian *ad Litem* found no evidence of any impropriety on Father's part. To the contrary, the Guardian expressed serious concern that Mother influenced Anne Marie's sexual behavior by placing such undue emphasis on it. He also concluded that Mother's desire to terminate the child's relationship with Father motivated her accusations.

Mother works part-time as a barber and lives with her mother, Linda Rice. Ms. Rice has been married six times and served time in prison for shooting one of her husbands. Mother has two brothers, both of whom at the time of trial were incarcerated in federal prison for conspiracy to sell marijuana. Although Father apparently lost a job after failing a drug test four years ago—prior to the parties' divorce—no details of this incident were presented at trial. Father, a Furman graduate, now drives a delivery truck and lives alone in Orangeburg County near his mother and sister. Both parents have flexible schedules, although Father would require daycare in the event he receives custody.

---

**3.** In addition, the child told Ginger Gist, a SCDSS caseworker, that she had "two daddies," one of whom was her uncle.

**4.** The first counselor to see the child, Janet Langston, reported to SCDSS in February 1996 that she believed Father had sexually abused his daughter based on her conversations with the child and demonstrations with anatomically correct dolls. At the time Ms. Langston filed her report, however, she had no knowledge of the extent of Mother's prior unfounded allegations. Later, when she interviewed Father and the child together, she found a normal parent-child relationship. In the six months of therapy that followed, the child never repeated her allegations, nor did any evidence develop during therapy to support the counselor's original concerns. When Ms. Langston informed Mother that she no longer suspected that Father had harmed the child, Mother terminated their relationship. Mother admitted at trial that she took Anne Marie to see another counselor, Evelyn Califf, because Janet Langston no longer believed the abuse occurred.

At the close of the hearing, the trial judge summarily denied Mother's request to terminate or restrict Father's visitation rights but noted he had "to wrestle" with the custody issue. He stated: "There's no basis for the mother's suspicions. She continues this fight in spite of the professional people trying to tell her that the child is not being molested by her father. And nobody else ever sees anything. Nobody except the mother."

In his written order, the trial judge stated he was "tempted to change custody," but decided to leave Anne Marie with Mother. While he noted Father would require daycare assistance if custody were transferred to him, he also stated daycare would be preferable if Mother persisted in her pursuit of unfounded sexual allegations.

## II. DISCUSSION

### A. Father's Appeal

■ The sole issue Father raises on appeal is that the family court judge erred in failing to find a substantial change in circumstances sufficient to warrant a change in custody. We agree.

■ In a custody dispute, the paramount and controlling factor is the welfare and best interest of the child. *Fisher v. Miller*, 288 S.C. 576, 578, 344 S.E.2d 149, 150 (1986). While the trial judge is in the best position to assess the veracity of the testimony of the witnesses, this court may find facts in accordance with its own view of the preponderance of the evidence. *Wilson v. Wilson*, 285 S.C. 481, 483, 330 S.E.2d 303, 304 (1985); *Sealy v. Sealy*, 295 S.C. 281, 283, 368 S.E.2d 85, 87 (Ct.App.1988). The burden of showing changed circumstances was, of course, on Father. "A change of circumstances justifying a change in the custody of the child *simply* means that sufficient facts have been shown to warrant the conclusion that the best interest of the child will be served by the change." *Boykin v. Boykin*, 296 S.C. 100, 101, 370 S.E.2d 884, 885 (Ct.App.1988). We hold Father met his burden of proof.

Although the Guardian did not make an express recommendation on the issue of custody, his written report is full of

238

concern for Anne Marie's welfare should she remain in Mother's custody. The Guardian stated:

I note several trends that I think are disturbing. First it appears that Ms. Watson and Linda Rice are intent on proving that Angus Poole has sexually abused his daughter. It is clear to me that they intend to continue with the attempts to prove the same regardless of the lack of any physical evidence thereof. . . . Another pattern that disturbs me greatly is the fact that when this case first commenced in 1993 in the Separate Maintenance and Support action, Ms. Watson (then Poole) asked that Mr. Poole be denied visitation. That was before there were any allegations of sexual abuse. Immediately after he was awarded visitation in August of 1993, Ms. Watson had alleged sexual abuse. . . . I am convinced that Ms. Watson, and her mother, will continue to move this child from counselor to counselor and doctor to doctor until such time as they are able to prove to someone that Angus Poole has sexually abused his daughter. This cannot be healthy for the child. I am extremely concerned about this particularly in light of the fact that I don't find any credible evidence to lead me to believe that this man has sexually abused his daughter. . . . I strongly believe that if Anne Marie is left in the custody of her mother and grandmother, she may ultimately claim any number of sexual improprieties on the part of her father. . . . If this conduct persists, I do not believe that it is in Anne Marie Poole's best interests to remain with her mother and grandmother. I believe that if she is to have any chance at a relationship with her father, it will be outside of her mother and grandmother's home.

We agree with the Guardian that Mother's persistent focus on the child's sexuality and genitalia is unhealthy. The numerous physical examinations and counseling sessions for unfounded sexual abuse are not in the child's best interest. Also disturbing is the nude role-playing session with Ms. York which Mother condoned. We believe the child's repeated exposure to doctors and therapists has already created serious harm, not only to the child emotionally, but also to the child's relationship with Father. These conditions are inherently injurious to the child's best interest and constitute a change of

circumstances warranting a change in custody.[5]  *See Routh v. Routh,* 328 S.C. 512, 492 S.E.2d 415, 418–19 (Ct.App. 1997) (false allegations of sexual abuse constitute a change in circumstance to be considered in making a custody award).

■  This court also believes a change in custody to Father will serve the child's best interest apart from the unfounded allegations of sexual abuse.  We agree with the Guardian that if Anne Marie is ever to develop a viable relationship with her Father, it must be outside the home of the Mother and grandmother.  From our view of the record, Mother has exhibited an unwillingness to facilitate the child's visitation with Father.  She has arbitrarily canceled Father's weekend visitation and has behaved improperly during exchanges with Father.  *See Morehouse v. Morehouse,* 317 S.C. 222, 226–27, 452 S.E.2d 632, 634–35 (Ct.App.1994) (upholding a custody award where the mother was unwilling to encourage a good relationship between the child and the father).  Moreover, Father's home is inherently more stable than the home Mother occupies with Ms. Rice, who, as the Guardian noted, "openly acknowledges her vehement dislike for Mr. Poole." Although Father lives alone, he has the support of his sister and mother who live nearby.  While he works during the day, he is willing to adjust his work schedule to accommodate the child's.  Moreover, we also see no harm in allowing the child to be placed in daycare in light of the current situation.

Although the family court judge was "tempted to change custody" but did not do so because the child "has been through so much," we disagree that removing her from Mother's custody would be more devastating than remaining in her custody.  We decline to provide Mother with any further opportunity to pursue unfounded allegations of sexual abuse, subject Anne Marie to repeated physical and psychological examinations, and harm her relationship with her Father.

---

**5.**  Although Mother argues she was "forced" to report her suspicions of sexual abuse and to seek termination of visitation, her arguments are circuitous.  Had Mother not initiated counseling sessions with Janet Langston after numerous examinations by physicians who found no evidence of abuse, Ms. Langston—who later changed her mind about her suspicions—would never have filed the report that led to a suspension of Father's visitation and another round of investigations which resulted in a finding of no sexual abuse.

Mother has pursued her unfounded course of conduct for the last five years of this young child's life. She has continued to demonstrate her dissatisfaction with the current visitation arrangement, and we find no reason to believe that her conduct will cease.[6] Therefore, we order a change of custody from Mother to Father, and remand the issues of child support and visitation to the family court.

## B. Mother's Appeal

Mother raises numerous issues on appeal, most of which relate to the family court judge's decision not to terminate or restrict Father's visitation rights. Quite clearly, Mother still does not accept the finding of no sexual abuse and seeks to terminate or to limit Father's visitation with Anne Marie. In light of our resolution of Father's appeal on the custody issue, it is not necessary for us to reach most of Mother's arguments. Two issues, however, merit consideration.

■ Mother contends the family court judge abused his discretion in requiring exclusive use of the child's prior therapist, as well as prohibiting further therapy by additional therapists. We disagree that the judge erred but modify his decision consistent with our award of custody to Father.

■ The family court is given wide latitude to take whatever actions it deems necessary in the best interest of the child. E.g., S.C.Code Ann. § 20-3-160 (1976); Barnett v. Barnett, 282 S.C. 343, 347, 318 S.E.2d 570, 573 (Ct.App.1984). In this case, the family court judge recognized that Mother was shuttling the child from doctor to doctor and therapist to therapist for repeated evaluations for sexual abuse. As noted in his order, the consequences of Mother's unsuccessful attempts to prove Father's guilt have been devastating. Moreover, the Guardian ad Litem reached similar conclusions:

One of the most disturbing things about this [case] is that practically every adult in Anne Marie's life is focused on sex and her genitalia. Unfortunately, all of these contacts have come through her mother. Specifically I refer to the nu-

---

**6.** As noted by the trial judge, "Mother's interests seem to have shifted from helping Anne Marie to proving the father is a sexual abuser and the consequences for the child are devastating. Whether the damage done can be repaired is questionable."

merous physical examinations by Dr. Traynham prior to visitations with her father. Subsequently she had two examinations by Dr. Susan Breeland as a result of the allegations of sexual abuse. More recently, Anne Marie has been examined by Dr. Baker's office and now has had a nude encounter with Ms. Watson's friend, Michele York. In addition to that, the counseling sessions that Anne Marie has now seem to focus on the sexual aspect of her life. It is no small wonder that this child would act out inappropriately. It concerns me that when a child understands that by touching herself, or mentioning sexually provocative subjects, she gets an adult's attention, that is one trait that she may very well exploit.

We agree with the family court judge and the Guardian that therapy is in the best interest of this child, especially in light of her parents' bitter divorce, accusations of sexual abuse, and accompanying investigations. We would also agree with the judge's designation of Ms. Langston as the child's exclusive therapist, given her longstanding relationship with the child if Anne Marie were to remain in Mother's custody. In view of our decision to award custody to Father, however, we modify the family court judge's order to provide that Father should select a counselor or therapist for Anne Marie, subject to the trial judge's approval, and that Mother shall not have Anne Marie evaluated, examined, or counseled by anyone without prior court approval. Father, as custodial parent, is now responsible for decisions relating to Anne Marie's counseling, including when it should be terminated.

■ Mother also contends the family court judge should not have awarded attorney fees to Husband and required her to share in the payment of the Guardian's costs. We disagree.

■ An award of attorney fees will not be overturned absent an abuse of discretion. *Stevenson v. Stevenson,* 295 S.C. 412, 415, 368 S.E.2d 901, 903 (1988). In awarding attorney fees, the court should consider each party's ability to pay his or her own fee, the beneficial results obtained by the attorney, the parties' respective financial conditions, and the effect of the fee on each party's standard of living. *E.D.M. v. T.A.M.,* 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). In determining the amount of attorney fees to award, the court

should consider the nature, extent, and difficulty of the services rendered, the time necessarily devoted to the case, counsel's professional standing, the contingency of compensation, the beneficial results obtained, and the customary legal fees for similar services. *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991). Our review of the record shows the judge considered these factors and made an appropriate award in light of the ill-founded nature of Mother's suit. We therefore affirm the trial judge's decision on attorney fees. Moreover, we do not believe the trial judge erred in apportioning the Guardian's costs between the parties.

Accordingly, the decision of the family court judge is

**AFFIRMED AS MODIFIED IN PART, REVERSED IN PART, AND REMANDED.**

HOWELL, C.J., and STILWELL, J., concur.