**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

Frederick Charles Tranfield, Appellant,

v.

Lilly Sophia Tranfield, Respondent.

Appellate Case No. 2015-002357

―――――――――

Appeal From Charleston County
Jack A. Landis, Family Court Judge
Daniel E. Martin, Jr., Family Court Judge

―――――――――

Unpublished Opinion No. 2018-UP-348
Heard June 6, 2018 – Filed August 1, 2018

―――――――――

**AFFIRMED AS MODIFIED**

―――――――――

Chris Paton, of Chris Paton LLC, of Mount Pleasant, and Courtney Wall Kerce, of Payne Law Firm, LLC, of Daniel Island, for Appellant.

Gregory Samuel Forman, of Gregory S. Forman, PC, of Charleston, for Respondent.

―――――――――

**PER CURIAM:** Frederick Tranfield (Father) appeals the ruling of the family court awarding custody of his two minor children to their Mother, Lilly Tranfield. Father argues the family court erred in: (1) awarding sole custody of the children to Mother

and restricting his visitation; (2) delegating authority to his therapist to determine visitation restrictions; (3) ordering he undergo a psychosexual evaluation; (4) awarding alimony; (5) incorrectly apportioning the parties' debts and assets; (6) awarding Mother attorney's fees; (7) restraining his speech; and (8) ordering support to be paid through income withholding. We affirm as modified.

## FACTS/PROCEDURAL HISTORY

Father and Mother met in California and married in May 2002 in Hawaii. They have two children—a girl (Daughter) born in August 2003 and a boy (Son) born in May 2005. The children were born in Japan and the parties adopted many Japanese cultural practices that they continued to abide by once they returned to the United States, including communal bathing and sleeping in the same room. The family moved to Charleston, South Carolina, in 2008. Once in Charleston, Father became the breadwinner, and Mother stayed at home and taught both children. Father worked as a freelance web designer, eventually working for Blue Acorn.[1]

In September 2012, Father peered over Mother's shoulder and noticed Mother emailing a friend about her "crush" on Daughter's ballet teacher.[2] The crush did not develop into anything further. Father confronted Mother about the email, and the two attended counseling in an attempt to save the marriage. But counseling failed to mend the growing chasm dividing the family due, in large part, to Father's bizarre behavior. As an example, Father brought the family's outdoor security camera indoors to film Mother over fears of "covert behavior" in October 2012, for a period of three to four months.[3] Mother eventually expressed displeasure being filmed and asked Father to stop. Father complied but resumed filming one week later. He stopped filming when a friend indicated the behavior was "creepy." Later, in December 2012, an altercation occurred between Mother and Father, terminating when Father forcefully grabbed Mother's arm and stated they were going to get a divorce. Mother fled and hid in the bathroom, while the children cried. In an effort

---

[1] Father was terminated from Blue Acorn in June 2016. Father has since found similar employment.

[2] Many have described Daughter as a ballet prodigy, having skills far exceeding others her age.

[3] Previously, in 2010, Father had used the outdoor camera indoors to film Mother home schooling the children. Father compiled a list of "healthy requests" for Mother's parenting and intended to review the videos with Mother. However, after Mother refused to review the videos, Father placed the camera outdoors again.

to resolve the dispute, Father required the family to hold hands in a circle and told the children Mother was mentally ill.

Mother eventually asked Father for a divorce in January 2013. In early 2013, based on the advice of counsel and a therapist, the family ceased communal bathing and sleeping as well as using the bathroom with the door open. The couple continued to live together, in separate rooms, because Mother did not have money to find another place to live. After Mother asked for a divorce, Father's relationship with Son remained mostly normal, but his relationship with Daughter became strained—she became rigid and angry towards him. In March 2013, while attempting to ease Daughter's tantrum, Father pinned her to her bed and would not let her up until she calmed down. Mother was present and filmed the event on her phone. Around the same time, Father emailed the family's therapist, admitting making many parenting mistakes. In the email, Father indicated he had told the children the following inappropriate information: Mother had a mental sickness, Mother's father went to jail for beating Mother's sister, Mother's father abused Father, and Mother's sister killed herself. Father also stated he had suggested taking away Daughter's dance classes as a consequence of her acting out towards him.

The parties finally separated in June 2013 and have lived in separate households since. In July 2013, shortly after Mother moved out, Father filed a complaint against Mother seeking, among other things, temporary relief, sole custody of Daughter and Son, child support, equitable division, and attorney's fees. Mother answered Father's suit and counterclaimed, also seeking sole custody of the children, child support, alimony, equitable division, and attorney's fees.

In lieu of a hearing on Father's motion for temporary relief, the parties submitted an agreement resolving the temporary issues, which the family court adopted on September 16, 2013. The parties temporarily agreed to share joint custody of the children, with Mother having primary physical and legal custody. Although Mother retained ultimate decision-making authority, Mother agreed to consult Father regarding major decisions affecting the children. Father had custody of Son on alternating weeks, whereas Father had custody of Daughter only every other weekend. The children were also scheduled to attend public school so Mother could seek employment. Additionally, the parties agreed Father would pay Mother $2,600 in unallocated support every month beginning in August 2013 until the family court could determine alimony and child support after a final hearing.

The agreement also set a schedule the parties were to adhere to prior to reaching any final agreement regarding custody and visitation—providing dates for

the appointment of a Guardian ad Litem and mandatory mediation. While the parties attempted to resolve their disputes, Father's bizarre behavior continued. In October 2013, in response to Daughter's behavior towards him, Father told her he was concerned she would grow up to cut herself, as in self-mutilation. Father's visitation with Daughter was suspended for three months as a result. Another incident occurred after visitation was reinstated. While disciplining Daughter, Father forcefully grabbed her arm and pulled her up the stairs. When Daughter told Father he was hurting her, Father called Daughter a liar. As a result, a no-contact order was issued, restraining the parties from physically disciplining the children.

Mother and Father were unable to resolve their disputes. After failed mediation, multiple increases in Guardian ad Litem fees, a Rule to Show Cause, and other incidents of Father's bizarre behavior, the family court conducted a five-day final hearing in December 2014. In its order, the family court equitably divided the parties' assets and debts, granted Mother spousal support, and gave Mother sole custody of the children. The family court granted Father supervised visitation and required him to pay child support, undergo a psychosexual evaluation, and pay Mother's attorney's fees. A divorce was granted on the ground of separation for one year. Father filed a motion for reconsideration, which the family court denied. Subsequently, upon motion by Mother, the clerk of court issued an income withholding order to garnish Father's wages to pay his support obligations. Father appealed both the final divorce order and income withholding order, and the appeals were consolidated.

## ISSUES ON APPEAL

1. Did the family court err in awarding custody to Mother, with Father having only limited and supervised visitation?

2. Did the family court err in delegating its authority concerning visitation to Father's therapist?

3. Did the family court err in ordering Father to undergo a psychosexual evaluation after issuance of the final order?

4. Did the family court err in awarding permanent periodic alimony?

5. Did the family court err in apportioning the parties' marital assets and debts?

6. Did the family court err in requiring Father to pay a $50,000 fee award?

7. Did the family court err in restraining Father's speech?

8. Did the family court err in ordering support be paid through income withholding?

## STANDARD OF REVIEW

"[T]he proper standard of review in family court matters is de novo . . . ." *Stoney v. Stoney*, Op. No. 27758 (S.C. Sup. Ct. filed April 18, 2018) (Shearouse Adv. Sh. No. 16 at 11); *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). In a de novo review, the appellate court is free to make its own findings of fact but must remember the family court was in a better position to make credibility determinations. *Lewis*, 392 S.C. at 385, 709 S.E.2d at 651–52. "Consistent with this de novo review, the appellant retains the burden to show that the family court's findings are not supported by a preponderance of the evidence; otherwise, the findings will be affirmed." *Ashburn v. Rogers*, 420 S.C. 411, 416, 803 S.E.2d 469, 471 (Ct. App. 2017). When the "evidence is disputed, the appellate court may adhere to the findings of the [family court, which] saw and heard the witnesses." *Woodall v. Woodall*, 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996). "On the other hand, evidentiary and procedural rulings of the family court are reviewed for an abuse of discretion." *Urban v. Kerscher*, Op. No. 5560 (S.C. Ct. App. filed May 23, 2018) (Shearouse Adv. Sh. No. 21 at 90).

## LAW/ANALYSIS

### I. Child Custody and Visitation

The family court awarded sole custody of the children to Mother, granting Father supervised visitation. Father argues the legislature's amendment of the Children's Code—specifically, section 63-15-230 of the South Carolina Code (2012)—eliminated the "exceptional circumstances" requirement for awarding joint custody. In the alternative, Father argues he has met the standard of exceptional circumstances, warranting an award of joint custody. We disagree.

The polestar in all child custody determinations is the best interests of the child. *Lewis v. Lewis*, 400 S.C. 354, 364, 734 S.E.2d 322, 327 (Ct. App. 2012). Although the family court has authority to order, and must consider, joint custody when requested, joint custody should be awarded only when exceptional circumstances show the arrangement is in a child's best interest. *Clark v. Clark*, Op.

No. 5558 (S.C. Ct. App. filed May 2, 2018); *see* S.C. Code Ann. § 63-3-530(A)(42) (2010) (stating the family court has jurisdiction to order joint custody when "the court finds it is in the best interests of the child"); S.C. Code Ann. § 63-15-230(C) (Supp. 2017) ("If custody is contested or if either parent seeks an award of joint custody, the court shall consider all custody options, including, but not limited to, joint custody, and, in its final order, the court shall state its determination as to custody and shall state its reasoning for that decision."). "[O]ur courts are particularly reluctant to award joint custody between estranged and quarrelsome parents." *Lewis*, 400 S.C. at 367, 734 S.E.2d at 328–29. Exceptional circumstances are present and may warrant an award of joint custody when there is "the potential for the custodial parent to effectively alienate [the child] from the non-custodial parent" in a sole custody arrangement. *Scott v. Scott*, 354 S.C. 118, 126, 579 S.E.2d 620, 624 (2003).

Here, pursuant to our de novo review, we find exceptional circumstances are not present and, thus, the family court properly awarded Mother sole custody of the children. The record is replete with instances of Father's bizarre behavior negatively affecting the children; more so Daughter—driving a wedge in their relationship and resulting in Daughter's recalcitrance towards Father. Additionally, Father told the children inappropriate information and repeatedly asserted Mother had a mental illness. Although Father's relationship with Son is not as strained as his relationship with Daughter, the Guardian ad Litem expressed concerns about Son witnessing conflicts between Daughter and Father, and Dr. Kay McNeill—the family's psychologist—testified that Son felt Father was being mean to Daughter.

Regarding parental alienation, there is no evidence that Mother, as the custodial parent, will endeavor to alienate Father from either of the children. As the family court noted, Father has maintained a position that Mother alienated Daughter from him and that is why his relationship with Daughter degraded. Dr. Davis Henderson, the children's previous psychologist, told Father that Mother was not alienating Daughter from him. Yet Father wrote Daughter's ballet teachers telling them parental alienation had been confirmed by a psychologist. Father continued with his assertion and even retained an expert on parental alienation during litigation in an effort to prove his theory. However, Father chose not to have that expert testify at the final hearing.

Father's behavior and the particularly quarrelsome nature of the parties' divorce leads us to conclude that awarding joint custody would not be in the children's best interests. Therefore, we affirm the award of sole custody.

Regarding visitation, Father argues the family court should not have *sua sponte* required his visitation with the children to be supervised, i.e., requiring a supervising party to be within sight and sound of Father and the children at all times during visitation. We disagree.

First, the family court has authority to grant relief not requested when issues are tried by implied consent. *See McComb v. Conard*, 394 S.C. 416, 426, 715 S.E.2d 662, 667 (Ct. App. 2011) (finding the family court had authority to restrain the parents from having their child "overnight in the presence of an adult of the opposite sex who was not related by blood or marriage," even though no party requested the restraint, because concerns were raised during trial regarding the child being in the presence of opposite-sex adults not related by blood or marriage). Second, the family court may impose restrictions and conditions on a non-custodial parent's visitation privileges the court believes are proper. *Frye v. Frye*, 323 S.C. 72, 76, 448 S.E.2d 586, 588 (Ct. App. 1994). Similar to custody determinations, the welfare of the child is paramount when determining visitation rights. *Nash v. Byrd*, 298 S.C. 530, 536, 381 S.E.2d 913, 916 (Ct. App. 1989). "The privilege of visitation must yield to the best interests of the children and may be denied or limited if the best interests of the children will be served thereby." *Frye*, 323 S.C. at 76, 448 S.E.2d at 588.

Here, despite neither party requesting supervised visitation, concerns were raised during the final hearing regarding Father's bizarre behavior and how that behavior has impacted the children. For example, in October 2013, in response to Daughter's behavior toward Father, Father told Daughter he was concerned she would grow up to cut herself—as in self-mutilation—and visitation was suspended for three months as a result. After visitation was reinstated, Father grabbed Daughter's arm and pulled her up the stairs in an attempt to discipline her. Father's recollection was that he guided Daughter up the stairs but Daughter had a different view—she repeatedly told Father he was hurting her arm, and Father called her a liar. Although Father's relationship with Son was not as strained as his relationship with Daughter, there were concerns of Son being forced to act as a peacemaker during visits with Father and Daughter.

Given the concerns raised at the final hearing over Father's bizarre behavior towards Daughter and the effect of that behavior on Son, we find the family court did not err in *sua sponte* placing sight and sound restrictions on Father's visitation. Additionally, although Father's behavior towards Son was not as troubling, treating the children equally would be in their best interests. Disparate application of the

sight and sound restrictions could further strain the relationship between Daughter and Father.

## II. Delegating Visitation

After granting Father supervised visitation, the family court found that the supervision restriction could be lifted in either of two ways after Father received the results of the psychosexual evaluation—(1) either party could request a modification, or (2) Father's therapist and Daughter's therapist could agree that supervision was no longer needed. Father argues the family court erred in delegating authority regarding visitation to the two therapists.

Family courts should not delegate authority regarding custody or visitation decisions. *Hardy v. Gunter*, 353 S.C. 128, 138, 577 S.E.2d 231, 236 (Ct. App. 2003); *Stefan v. Stefan*, 320 S.C. 419, 422, 465 S.E.2d 734, 736 (Ct. App. 1995). "[I]t is the family court [that] is charged with the authority and responsibility for protecting the interest of minors involved in litigation, not the guardian or any other person whom the court may appoint to assist it." *Hardy*, 353 S.C. at 138, 577 S.E.2d at 236 (quoting *Stefan*, 320 S.C. at 422, 465 S.E.2d at 736); *id.* ("We caution family court judges *NOT* to delegate *any* responsibility to a guardian in regard to visitation of children with parents." (emphasis in original)).

We find the family court improperly delegated its authority to the two therapists because the language in the order indicates the supervision restriction can be lifted by the therapists without any action by the family court. Thus, the family court has delegated *some* responsibility to determine visitation. As a remedy, we modify the order's language to clarify that the two therapists can recommend to the family court the supervision restriction be lifted but the family court, as protector of the children's interests, has sole authority to determine whether circumstances warrant lifting the restriction.

## III. Father's Psychosexual Evaluation

Father argues the family court erred in ordering him to undergo a psychosexual evaluation. We disagree.

A family court has jurisdiction "to order either before, during, or after a hearing a mental, physical[, or] psychiatric examination as circumstances warrant." S.C. Code Ann. § 63-3-530(A)(26) (2010); *see Nash*, 298 S.C. at 536–37, 381 S.E.2d at 917 (finding the family court did not err in suspending a father's visitation

privileges until he underwent counseling because, among other things, the father refused to work to resolve visitation conflicts). Additionally, a family court has "wide latitude to take whatever actions it deems necessary in the best interest of [a] child." *Watson v. Poole*, 329 S.C. 232, 240, 495 S.E.2d 236, 240 (Ct. App. 1997). In *Watson*, a mother contended the family court erred in requiring exclusive use of her child's prior therapist and prohibiting further therapy by additional therapists. *Id.* This court affirmed, agreeing with the family court's limitations because the child's mother had shuttled the child to multiple doctors and therapists for sexual abuse evaluations—in an attempt to prove unfounded sexual abuse allegations against the father—having devastating effects on the child. *Id.* at 240, 495 S.E.2d at 240–41.

We find the family court did not err by requiring Father to obtain a psychosexual evaluation. The family court was especially cognizant of the best interests of the children. At the hearing on Father's motion for reconsideration, the family court explained it was alarmed at Father's insistence on engaging in behavior that made Daughter uncomfortable. Expert testimony established that Daughter had become uncomfortable with communal bathing. The family court was also concerned with an incident at a dance exhibition—Father wanted access to the general dressing room with Daughter but was denied because multiple young girls were using it, and Father created a scene when he was denied. The family court stated it had "to err on the side of caution when it [came] to the well[-]being of the children" and thought the evaluation was a reasonable requirement. We find the family court was within its authority to order Father to submit to the evaluation.

## IV. Alimony Award

The family court awarded wife the following permanent periodic alimony: beginning January 1, 2015, $1,250 every month for the following twelve months and, beginning January 1, 2016, $750 every month. Father argues the alimony award is excessive and should be reduced. Specifically, Father contends the court erred in failing to consider "the overall financial situation of the parties [and] the ability of the supporting spouse to pay."

"In proceedings for divorce . . . the court may grant alimony . . . in such amounts and for such term as the court considers appropriate as from the circumstances of the parties and the nature of case may be just . . . ." S.C. Code Ann. § 20-3-130(A) (2014). "Alimony is a substitute for the support [that] is normally incident to the marital relationship." *Johnson v. Johnson*, 296 S.C. 289, 300, 372 S.E.2d 107, 113 (Ct. App. 1988). "If a claim for alimony is well founded, the law favors the award of permanent, periodic alimony." *Id.* at 301, 372 S.E.2d at 114.

The family court must consider and give as much weight as it finds appropriate to the thirteen factors in section 20-3-130(C) of the South Carolina Code (2014). The family court is not required to specifically evaluate each and every factor, just the relevant factors. *King v. King*, 384 S.C. 134, 142, 681 S.E.2d 609, 613 (Ct. App. 2009). The three most "important factors in awarding periodic alimony are (1) the duration of the marriage; (2) the overall financial situation of the parties, especially the ability of the supporting spouse to pay; and (3) whether either spouse was more at fault than the other." *Id.* at 141, 681 S.E.2d at 613 (quoting *Patel v. Patel*, 359 S.C. 515, 529, 599 S.E.2d 114, 121 (2004)).

Here, Father's first financial declaration, filed in December 2014, showed he had $5,130 in gross monthly income, $3,626.28 after deductions, and monthly expenses of $6,278.11. Father's third financial declaration, filed after the divorce in May 2015, showed $6,446.68 in gross monthly income, $4,650.46 after deductions, and $4,415.67 in monthly expenses. Mother's financial declaration, filed December 2014, showed $500 in gross monthly income and $5,691 in expenses. However, the parties acknowledged Mother had an annual earning capacity of $30,000, which would equate to $2,500 in gross monthly income.

We find the family court did not err in the amount it awarded Mother in permanent, periodic alimony. In its order denying Father's motion for reconsideration, the family court noted that Father earns twice what Mother is capable of earning and that Mother had not been working for an extended period of time because she cared for and taught the children. Additionally, in making his excessive-alimony argument to the family court, Father failed to consider that he can deduct alimony from his taxes while Mother must pay taxes on the alimony. Further, Father's financial declaration listed two voluntary contributions and failed to account for a reduction in his financial responsibilities as a result of the divorce—including no longer being responsible for Mother's car insurance, health insurance, and expenses related to the children. The reduction of expenses is apparent when comparing Father's first and third financial declarations—his monthly expenses reduced from $6,278.11 to $4,415.67. Essentially, Father and Mother have similar monthly expenses yet Father makes more than twice as much as Mother. To balance this disparity and give Mother time to achieve her $30,000 earning capacity, the family court awarded Mother alimony of $1,250 per month for the first year and $750 per month thereafter. Therefore, we find Father has not carried his burden of establishing that the preponderance of the evidence shows the family court's award of alimony is excessive.

Furthermore, we find the cases cited by Father—*Dickert v. Dickert*, 387 S.C. 1, 691 S.E.2d 448 (2010) and *Wannamaker v. Wannamaker*, 395 S.C. 592, 719 S.E.2d 261 (Ct. App. 2011)—are distinguishable. The standard of living established in *Dickert* far exceeded the standard of living established in this case and no children were born of the marriage in *Wannamaker*.

## V.    Equitable Apportionment

In apportioning the couple's assets and debts, the family court relied on the Marital Asset Addendum filed by Mother, finding it was "the clearest evaluation of the marital assets and debts that was presented at trial." Father asserts the family court erred in equitably distributing the parties' property. Father takes issue with the court's valuation of the following assets and debts: (1) Toyota Sienna, (2) 2013 tax debt, and (3) Schwab account. We will address each asset and debt below.

Toyota Sienna

The Addendum listed the value of the Toyota Sienna at $10,000. Father argues the vehicle was subject to a loan of $3,300, which was not factored into the vehicle's value. In his reply brief, Father argues "the value of the vehicle should have been reduced by around [$3,000]." Therefore, Mother shares $1,500 of the debt. Mother agrees that the vehicle was subject to a loan and its value should be reduced, but argues the valuation by the family court was within the family court's discretion. Because our standard of review is de novo and both parties agree the Toyota Sienna was subject to a loan, we find the loan should be accounted for to reduce the value of the marital estate. Further, we find the value should be reduced by the amount suggested by Father in his reply brief, $3,000. Therefore, the value of the marital estate, as listed in the Addendum, should be reduced from $19,833.15 to $16,833.15.

2013 Taxes

The family court recognized the parties would file taxes separately for 2013 and required each party to be responsible for their own 2013 tax debt. The family court also required Father to pay all of 2012's tax debt. Father argues half of the 2013 tax debt, $3,000, is marital because the divorce action was filed in July 2013 and, therefore, Mother is responsible for $1,500 of 2013's tax debt.

We find this argument is not preserved because the family court did not rule on the marital character of 2013's tax debt and Father did not request a ruling on the

marital character of 2013's tax debt in his Rule 59(e), SCRCP, motion. *See Bodkin v. Bodkin*, 388 S.C. 203, 219, 694 S.E.2d 230, 239 (Ct. App. 2010) (finding a husband's argument that the family court did not consider the tax consequences to him when dividing the marital property was not preserved because the family court did not rule on the issue and the husband failed to raise it in a Rule 59(e) motion).

Schwab Account

The Addendum listed the Schwab account's value at $20,151.49. The Addendum acknowledged that the account balance as of the date of filing was $8,321.59, but reasoned the higher amount was subject to equitable division because, right before filing for divorce, Father paid fees for which he was solely responsible— legal fees, psychological evaluation fees, and mediation fees. Father argues the relevant date of valuation is the date of filing and, because the value on the date of filing was $8,321.59, then the court should have apportioned that amount. Should he be responsible for the pre-filing payments to his attorney, mediation fees, and psychological evaluation fees, Father argues those amounts add up to $8,330, and adding that value back to the value of the Schwab account on the date of filing would be $16,651.59, not the higher amount the family court valued. Mother argues similarly to Father's reply argument.

"Marital Property" is defined as "all real and personal property [that] has been acquired by the parties during the marriage and [that] is owned as of the date of filing or commencement of marital litigation." S.C. Code Ann. 20-3-630(A) (2014). "By requiring the estate to be identified as of the date marital litigation is filed, the [l]egislature has elected to foreclose the spouses from litigating every expenditure or transfer of property during the marriage." *Panhorst v. Panhorst*, 301 S.C. 100, 105, 390 S.E.2d 376, 379 (Ct. App. 1990). "The statute wisely prevents the other spouse from resurrecting these transactions at the end of the marriage to gain an advantage in the equitable distribution." *Id.*

However, when parties are separated before commencing marital litigation, a valuation date other than the commencement of marital litigation may be used to avoid inequitable results. *See Wannamaker*, 305 S.C. at 41 406 S.E.2d at 183. Additionally, this court in *Dixon* cited, with approval, the family court's finding that when "one spouse has dissipated marital assets, the court will value the assets as of some date before the dissipation and treat the dissipated assets as part of the dissipating spouse's share of the marital estate." *Dixon v. Dixon*, 334 S.C. 222, 232, 512 S.E.2d 539, 544 (Ct. App. 1999).

Here, Mother told Father she wanted a divorce in January 2013. Father filed for divorce in July 2013. Father conceded at the final hearing that one or two months prior to filing for divorce, he paid $1,350 for mediation fees, $5,000 to his mother (allegedly as a reimbursement for legal fees), and $1,980 to Dr. Bart Saylor, all out of the Schwab account.

Given our de novo standard of review, we find the specifically identified payments made by Father should be credited to the Schwab account's value as it was on the date of filing, $8,321.59. Crediting those payments would make the Schwab account's value $16,651.59 ($8,330 + $8,321.59) for the purpose of equitable apportionment. This would result in a reduction in the value of the marital estate of $3,500.

After all debts and assets were considered, the family court valued the marital estate at $19,833.15. However, we find the family court overvalued the marital estate by $6,500—the actual value of the marital estate is $13,333.15. One-thousand dollars of that is attributable to Mother while the rest is attributable to Father— $12,333.15. In order to equitably distribute the marital estate, Father would have to pay Mother $5,666.57, leaving each party with $6,666.57 in value from the marital estate and effecting a 50-50 equitable distribution. We modify the family court's order to reflect these adjustments.

## VI.  Attorney's Fees

Father argues the family court erred in awarding Wife $50,000 in attorney's fees because he does not have the ability to pay.

A family court's award or denial of attorney's fees is reviewed de novo. *See Stoney*, Op. No. 27758 (finding the court of appeals erred and, pursuant to *Lewis v. Lewis*, should have reviewed a family court's denial of attorney's fees de novo). In deciding whether or not to *award* attorney's fees, the family court must consider: "(1) the party's ability to pay [his or her] own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) [the] effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). In determining whether the *amount* of an attorney's fee is reasonable, the court should consider:

> (1) the nature, extent, and difficulty of the case;
>
> (2) the time necessarily devoted to the case;

(3) professional standing of counsel;

(4) contingency of compensation;

(5) beneficial results obtained; [and]

(6) customary legal fees for similar services.

*Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

"A party's ability to pay is an essential factor in determining whether an attorney's fee should be awarded, as are the parties' respective financial conditions and the effect of the award on each party's standard of living." *Srivastava v. Srivastava*, 411 S.C. 481, 489, 769 S.E.2d 442, 447 (Ct. App. 2015) (quoting *Rogers v. Rogers*, 343 S.C. 329, 334, 540 S.E.2d 840, 842 (2001)). An attorney's fee award is excessive when it represents a substantial portion of the paying spouse's gross annual income. *See id.* at 490, 769 S.E.2d at 447 (finding an attorney's fee award representing 90% of the paying spouse's gross annual income was excessive); *Rogers*, 343 S.C. at 334, 540 S.E.2d at 842 (finding an attorney's fee award representing 16% of the paying spouse's annual income was excessive).

Although the ability to pay is an essential factor, it is not the only factor to consider—particularly when the spouse against whom fees are awarded has hindered, or been uncooperative during, litigation. *See Blackwell v. Fulgum*, 375 S.C. 337, 346, 652 S.E.2d 427, 431 (Ct. App. 2007) ("Generally, we would be inclined to determine an award of attorney's fees in accordance with the factors outlined in the case of *E.D.M. v. T.A.M.* However, if the case before us presents an added dimension of an uncooperative spouse who hampers a final resolution of the issues in dispute, we will not reward an adversary spouse for such conduct." (footnote omitted)). A court is apt to award attorney's fees against an uncooperative spouse even when the award represents a substantial portion of the paying spouse's gross annual income. *See Spreeuw v. Baker*, 385 S.C. 45, 72–73, 682 S.E.2d 843, 857 (Ct. App. 2009) (affirming an attorney's fee award of $43,675 to a mother despite expressing concern the fee award represented 40% of the father's annual income because "a review of the record reveal[ed] that [the father's] uncooperative conduct greatly contributed to the litigation costs associated" with the case).

Reasoning an adversarial spouse should not be rewarded for his or her behavior, courts can require that spouse to be responsible for the attorney's fees of

the non-paying spouse that are attributable to the adversarial spouse's conduct. *Anderson v. Tolbert*, 322 S.C. 543, 549–50, 473 S.E.2d 456, 459 (Ct. App. 1996). Examples of conduct prolonging litigation include requiring one spouse to seek orders protecting his or her children or to obtain sanctions for violating court orders. *Id.* at 550, 473 S.E.2d at 459; *see Lewin v. Lewin*, 396 S.C. 349, 360, 721 S.E.2d 1, 7 (Ct. App. 2011) (finding an award of attorney's fees to a mother was appropriate based, in part, on the three-year length of the case and the father's uncooperative conduct in failing to timely respond to the mother's requests).

Here, the family court awarded Mother $50,000 in attorney's fees. The family court considered the factors from *E.D.M* and *Glasscock* and found (1) Father was in a better position to pay attorney's fees than Mother; (2) Mother's attorney achieved beneficial results; and (3) if Mother had to pay all her attorney's fees it would negatively impact her ability to support herself and the children. The court also acknowledged that Father's unreasonableness and inflexibility prolonged litigation. Mother's proposed settlements offering to resolve many issues before the court were more favorable to Father than what the court eventually awarded.

The court expanded further on its finding that Father's actions prolonged litigation in its order denying Father's motion for reconsideration. The court noted, for example, Father maintained he should be awarded sole custody and that Mother was alienating the children from him; he even retained an expert on parental alienation. Yet, at the final hearing, he abandoned both positions—requesting a continuation of joint custody and choosing not to have his expert testify. The family court considered Father's financial situation but determined he should nevertheless bear the burden of his actions, rather than Mother, because she was forced to incur the costs associated with defending against Father's positions.

Father has not shown by a preponderance of the evidence that the family court's award of attorney's fees is excessive. Although the award represents a substantial portion of Father's income, his inflexibility and the unreasonableness of his positions increased the cost of litigation. *See Blackwell*, 375 S.C. at 346, 652 S.E.2d at 431 ("Generally, we would be inclined to determine an award of attorney's fees in accordance with the factors outlined in the case of *E.D.M. v. T.A.M.* However, if the case before us presents an added dimension of an uncooperative spouse who hampers a final resolution of the issues in dispute, we will not reward an adversary spouse for such conduct." (footnote omitted)). The family court noted that Mother's proposed settlements offered to resolve the issues in a manner more favorable to Father than the court ultimately determined. By maintaining his positions on custody and alienation, Father forced Mother to incur substantial

attorney's fees.[4]  We believe Father should bear the costs Mother incurred in defending against his actions.  *See Anderson*, 322 S.C. at 549–50, 473 S.E.2d at 459 (finding courts can require an adversarial spouse to be responsible for the portion of attorney's fees incurred by the other spouse that are attributable to the adversarial spouse's conduct).

Furthermore, requiring Mother to pay the entirety of her attorney's fees with her income would drastically reduce her standard of living.  *See E.D.M*, 307 S.C. at 477, 415 S.E.2d at 816 (listing the "effect of the attorney's fee on each party's standard of living" as a factor to consider when determining whether to award attorney's fees); *see also* Roy T. Stuckey, Marital Litigation in South Carolina 716 (4th ed. 2010) ("An award of fees and costs is based on the duty of a spouse to provide necessary spousal and child support, and it reflects the reality that legal services are as necessary as food and lodging when a spouse becomes involved in litigation." (citing *Anderson*, 322 S.C. at 545–46, 473 S.E.2d at 457)).  Therefore, we affirm the family court's award of attorney's fees.

## VII.  Prior Restraint

Father argues the family court erred in restraining his speech by imposing the following injunction:  "Father shall be restrained from making 'diagnoses' about the children or the Mother.  Father shall be restrained from 'diagnostic name calling' with regard to children or Mother (i.e. using diagnostic labels, to or about them, such as 'passive aggressive'), and/or from calling the children 'liars.'"  Father asserts the restraint violates his freedom of speech because it is not narrowly tailored.

We find this issue is not preserved.  To preserve an issue, it must be raised to and ruled upon by the family court.  *Bodkin*, 388 S.C. at 219, 694 S.E.2d at 239. Constitutional arguments are also subject to rules of issue preservation.  *Bakala v. Bakala*, 352 S.C. 612, 625, 576 S.E.2d 156, 163 (2003) (finding a husband's due process claim was not preserved because it was raised for the first time on appeal). Father presents his prior-restraint argument for the first time on appeal.  Therefore, it is not preserved.

---

[4] Mother's attorney accrued over $110,000 in fees representing Mother.  Mother notes that, between the time she offered to settle and the conclusion of trial, she incurred $51,000 in attorney's fees and costs.  Mother sent a proposed settlement on September 17, 2014.  Between that date and the end of trial, Mother incurred an additional $51,473.91 in attorney's fees.

## VIII. Income Withholding

Father argues the family court erred in ordering support to be paid through income withholding. Specifically, Father argues the court failed to serve him with a notice of delinquency before serving the withholding order on his employer—Blue Acorn—thereby depriving him of his right to petition the court to stay service of the withholding order. Father requests this court to reverse the family court's order upholding the withholding of support payments from his income from Blue Acorn.

We find this issue is moot because Father no longer works for Blue Acorn. *Mathis v. S.C. State Highway Dep't*, 260 S.C. 344, 346, 195 S.E.2d 713, 715 (1973) ("A case becomes moot when judgment, if rendered, will have no practical legal effect upon [the] existing controversy. This is true when some event occurs making it impossible for [the] reviewing [c]ourt to grant effectual relief."). Therefore, we decline to address the merits.

**AFFIRMED AS MODIFIED.**

**HUFF, GEATHERS, and MCDONALD, JJ., concur.**